## HEIM v. NEW YORK STOCK EXCHANGE.

(Supreme Court, Special Term, Kings County. September 3, 1909.)

1. EXCHANGES (§ 4*)—REGULATION—LEGISLATIVE POWER.

The Legislature may interfere with the rules and methods of the New York Stock Exchange, which is a voluntary association organized to furnish facilities to its members in buying and selling stocks and bonds for others on commission, on it being assumed that the exchange is charged with a public interest, so that the business must be carried on without unjustifiable discrimination; but the courts on motion of a nonmember, cannot interfere.

[Ed. Note.—For other cases, see Exchanges, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. MONOPOLIES (§ 17*)—RULES OF EXCHANGE—VALIDITY—"ILLEGAL COMBINATION IN RESTRAINT OF TRADE."

A resolution of the New York Stock Exchange, a voluntary association organized to furnish facilities to its members in buying and selling stocks and bonds for others on commission, which prohibits any member from transacting any business with or for any member of a rival exchange, not adopted through any bad motives, but to protect its own interests, is not an "illegal combination in restraint of trade," in violation of Laws 1899, p. 1514, c. 690.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 17.*].

3. EXCHANGES (§ 12*)—ACTION BY NONMEMBER.

A nonmember of a stock exchange, organized as a voluntary association to afford facilities to its members in buying and selling stocks and bonds for others, may not enjoin the enforcement of an illegal resolution of the exchange; but the members thereof may disregard it, and seek equitable relief against any attempt to enforce it.

[Ed. Note.—For other cases, see Exchanges, Dec. Dig. § 12.*]

4. CONTRACTS (§ 138*)—CONTRACTS IN RESTRAINT OF TRADE—VALIDITY.

The law does not prohibit the making of contracts in restraint of trade, but merely declines to recognize their validity or to enforce them.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

Action by Marcus Heim against the New York Stock Exchange. Injunction prayed for denied.

Delmas, Towne & Spellman (Delpin M. Delmas, of counsel), for plaintiff.

Carter, Ledyard & Milburn (Lewis Cass Ledyard and Walter F. Taylor, of counsel), for defendant Stock Exchange.

Harry R. Kohn, for defendants Josephthal, Rothchild, Hochstadter, and Albert Loeb & Co.

CRANE, J. The New York Stock Exchange is a voluntary association, limited to 1,100 members, furnishing facilities for the transaction of the business of buying and selling stocks and bonds for others on commission. The exchange as such does no business, although its governing committee of 40 can regulate the conduct of the members under the constitution and resolutions. One of the resolutions, adopted May 19, 1909, was as follows: .

"Resolved, that any member of this exchange who transacts any business, directly or indirectly, with or for any member of the Consolidated Stock Ex-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

change, who is engaged in business upon the said Consolidated Stock Exchange, shall, on conviction thereof, be deemed to have committed an act or acts detrimental to the welfare of this exchange."

Section 6 of article 17 of the constitution reads:

"A member who shall have been adjudged, by a majority of votes of all the existing members of the governing committee, guilty of willful violation of the constitution of the exchange, or of any resolution of the governing committee regulating the conduct or business of members, or of any conduct or proceeding inconsistent with just and equitable principles of trade, may be suspended or expelled as the said committee may determine, unless some other penalty is expressly provided for such offense."

A member of the Stock Exchange, therefore, who transacts any business with an active member of the Consolidated Exchange is liable to suspension or expulsion. This plaintiff is and was an active member on the Consolidated Exchange, also transacting business with Albert Loeb & Co., a Stock Exchange house, through whom he bought and sold stocks and bonds upon the floor of said Stock Exchange. On May 21, 1909, Albert Loeb & Co. notified the plaintiff that, because of the above resolution of their exchange, he must withdraw his account, and that thereafter they could transact no further business with him. It is alleged, and not denied, that by reason of the constitution and resolution above referred to all the members of the Stock Exchange will refuse to buy or sell stocks and bonds for the plaintiff, or any other active member of the Consolidated Exchange. It is conceded that the Consolidated Exchange, organized in 1875 as a mining stock exchange, is to a degree a rival of the Stock Exchange; its sales of stocks averaging per annum nearly one-fourth of those of the latter. There are 1,225 members, of whom 450 are active. The nature of the business transacted upon the floor of the Consolidated Exchange is very largely the same as that of the Stock Exchange.

The plaintiff by this action seeks to enjoin the Stock Exchange from enforcing this resolution of nonintercourse as to him, and to prevent Albert Loeb & Co. from rejecting his account upon the reasons stated by them. He claims: First, that the resolution is void, because it constitutes an illegal combination in restraint of trade; second, it is void, because the business transacted in the Stock Exchange is affected with a public interest, and must, therefore, be carried on without unjustifiable discrimination; third, its enforcement may be restrained at the suit of the plaintiff.

Disposing of the second contention at the outset, I may say that, if the Stock Exchange is affected with a public interest, this may justify the interference with its rules, regulations, and methods by the Legislature of the state, but not by the courts upon motion of nonmembers, Wilson v. Telegram Co. et al. (Sup.) 3 N. Y. Supp. 633.

As to the first and third claim, is this resolution void as being an illegal combination in restraint of trade, and may its enforcement be restrained at the suit of the plaintiff? Any one of the members could refuse to do business with the plaintiff, and no law would interfere. All of the members individually could refuse to buy or sell for the plaintiff, and it would simply be a business misfortune. The question

is: Can the members unite and agree not to do business with the plaintiff while he is a member of a rival association?

It would be illegal for them to agree not to transact any business with him at all, for no other reason than that they did not like him or his business, and it would be illegal for them to combine not to buy or sell for him, while he was a member of any particular club, church, or political organization, for this would be a clear interference with his liberty and a direct attack upon him; but can they base their non-intercourse resolve upon the ground that the plaintiff belongs to and is actually engaged in building up and strengthening a rival to their detriment? I think they can. The distinction which the decided cases make is that, if the combination not to do business with the plaintiff is for the purpose of injuring and destroying him, it is illegal; but if injury to him follows as an incident from action sought to protect, increase, and strengthen the business of the associates, then it is as legitimate as other forms of competition which the law leaves parties and combinations free to indulge in. The plaintiff is not driven out of the stock and bond business. He simply cannot enjoy one privilege openly and the other secretly. He can buy and sell freely of the Stock Exchange members upon ceasing active work for its rival, or he can confine his activities to the Consolidated Exchange, of which he is a member.

The only condition which the above resolution of the Stock Exchange places upon him is that he shall not continue indirectly to injure their business. It is a case of give and take. It cannot be said, in view of the history of the two exchanges, that this resolution has been passed through any bad motives or for the purpose of injuring the plaintiff. From the papers submitted it appears that, but for the well-organized system of the Stock Exchange and the ready, speedy method of ascertaining the salable value of securities, the other exchange would have little business; that the business of the Consolidated in Stock Exchange listed stocks and bonds depends upon the prices ruling at the latter place. In its report to the Governor of the state the committee on speculation in securities and commodities, June, 1909, have the following to say about these two exchanges:

"The Consolidated Exchange was organized as a mining stock exchange in 1875, altering its name and business in 1886. Although of far less importance than the Stock Exchange, it is nevertheless a secondary market of no mean proportions. By far the greater part of the trading is in securities listed upon the main exchange, and the prices are based upon the quotations made there. * * * Very strained relations have existed between the two security exchanges since the lesser one undertook in 1886 to deal in stocks. The tension has been increased by the methods by which the Consolidated obtains quotations of the other, through the use of tickers conveying them. It is probable that without the use of these instruments the business of the Consolidated Exchange would be paralyzed."

Various litigations over the use of information thus obtained evidence the efforts which have been made by the Stock Exchange to protect its good will and prestige. The following cases bear out my statement of the law:

In National Protective Association of Steam Fitters and Helpers v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St.

118 N.Y.S.—38

Rep. 648, the Court of Appeals of this state held that it was lawful for one labor organization to call out all of its men on a strike, and refuse to work with a man who was a member of a rival union. As a practical result all work was stopped. That the nonmember would be unable to obtain work anywhere in New York City where the same conditions would not prevail did not make this form of competition for work illegal. The effect of the decision, of course, would be that to get work the man must join the stronger union. Mr. Justice Parker said:

"Whenever the courts can see that a refusal of members of an organization to work with nonmembers may be in the interest of the several members, it will not assume, in the absence of a finding to the contrary, that the object of such refusal was solely to gratify malice and inflict injury upon such nonmembers."

Turn about is fair play. The law which was applied by our Court of Appeals to the labor organization is now being applied by capital— a result, of course, to be expected. This case did not go without strenuous dissent upon the part of three members of that court, as evidenced by the splendid dissenting opinion of Judge Vann; but the case has been followed by other courts, and it is the law which I am obliged to apply until it is modified or limited by the highest court of our state, as some day it may be. See, also, Mills v. U. S. Printing Company of Ohio, 99 App. Div. 605, 91 N. Y. Supp. 185; National Fireproofing Company v. Mason Builders' Association (C. C. A.) 169 Fed. 259.

A case very nearly in point with the present one arose in Illinois. American Live Stock Commission Company v. Chicago Live Stock Exchange, 143 Ill. 210, 32 N. E. 274, 18 L. R. A. 190, 36 Am. St. Rep. 385. The facts in this case were as follows: The Chicago Live Stock Exchange adopted the following by-laws and rules:

(1) "No person shall be received for membership in this exchange who in any manner represents or acts for, either as an officer, agent, or broker, or commission merchant, any other live stock corporation or exchange whose charter regulations, rules, or by-laws provide for discrimination in rates or charges or commissions between stockholders or other patrons or customers, whether under guise of dividends, drawbacks, or any other scheme or device whatever."

(2) "If any member of this exchange shall hereafter act for, either as officer, agent, broker, or commission merchant, any other live stock corporation or exchange, whose charter, regulations, rules, or by-laws provide for discrimination in rates or charges or commissions between stockholders or other persons or customers, whether under the guise of dividends, drawbacks, or any other scheme or device whatever, he shall be liable to suspension for the first offense and to expulsion for any subsequent offense.

"Nobody in this exchange shall buy or cause to be bought at the Union Stockyards, Chicago, Illinois, from any agent, individual, firm, incorporation, or other live stock commission company, who are or may be regularly selling live stock for nonresidents on commission, unless some one or more of the members of such firm or stockholders of such company are members in good standing of this exchange: provided, however, that any party or parties beginning a live stock commission business at said yards shall not be considered subject to these rules until thirty days from the date of their beginning such business; and provided, further, that nothing herein contained shall be construed as in any manner prohibiting any party from selling his own live stock on the market of such stockyards, or any member of this exchange from buying such stock of the owner."

A bill was filed in chancery, brought by the American Live Stock Commission Company, to enjoin the exchange from carrying out and enforcing these regulations. Among other things the court had this to say:

"Absolute freedom of commercial intercourse to which a party may be entitled is not interfered with by the refusal of another to deal with such party on any terms. The refusal of any or all of the members of the exchange to purchase live stock of the complainant is merely an exercise of their clear legal prerogative; and, if they have a right to so refuse, it is difficult to see how an agreement, as between themselves, to abstain from dealing with the complainant, is a matter in respect to which the complainant is entitled to any species of equitable relief. * * * If the by-laws in question are invalid, because of being in improper restraint of trade, they are merely void, and the members of the exchange, being under no obligation to obey them, may perhaps be entitled, at their own instance, to protection against such disciplinary consequences as the exchange may see fit to impose in case of disobedience. But such protection cannot be invoked in their behalf by a stranger, nor can they be required to disobey such rules except at their own volition. * * * These rules having been adopted, presumably, with the approval of the members of the exchange, there is no reason to suppose that they will not be voluntarily obeyed, and such voluntary obedience is a matter which the courts have no power to restrain. But the position is taken on behalf of the complainant, and most strenuously insisted upon, that the live stock market at the Union Stockyards, by reason of its magnitude and its far-reaching influence upon the commerce of the country, has become a public market, and therefore impressed with the public use, and that not only said market, but all those doing business therein, are brought within the influence of those rules of public policy which apply to and govern public employments, and which it is the business of the courts to administer and enforce. * * * The bill alleges, and the truth of the allegation is not questioned, that the amount of business annually transacted at said stockyards is such as to constitute the market thus established the largest live stock market in the world. * * * But we are not prepared to hold that the mere fact that the business of a particular market has become very large gives to the courts any power to declare such markets public, and impressed with the public use, or to apply to them any rules of public policy peculiar to that class of markets. * * * The business which is here sought to be subjected to a public use was, at its commencement, confessedly private, and private only; and the public use is sought to be impressed upon it, not by virtue of any voluntary grant to the public, but simply because, by mere process of growth and expansion, the business has reached such magnitude as to affect public interests because of its magnitude alone."

The plaintiff's counsel recognizes this authority as being in point in this litigation and disposes of it in his brief in these words:

"Much that is said in the opinion is irreconcilable with more recent decisions and with principles in formerly established cases."

But the law of this case seems to have been reiterated and followed in the case of National Fireproofing Company v. Mason Builders' Association, decided by the Circuit Court of Appeals for the Second Circuit in March, 1909 (cited above).

But, supposing for the moment that the resolution of the Stock Exchange is illegal as in restraint of trade, as claimed by the plaintiff, yet the plaintiff, a nonmember, could not enjoin its enforcement. The members might disregard it, and continue doing business with the plaintiff, and, if any action was attempted to suspend or expel them, then they might seek equitable relief; but strangers have not this right,

but must seek damages at law. As was said in the Illinois case, above cited:

"The law does not prohibit the making of contracts in the restraint of trade. It merely declines to recognize their validity or to enforce them."

See, also, Russell v. New York Produce Exchange, 27 Misc. Rep. 381, 58 N. Y. Supp. 842.

The plaintiff submitted a very voluminous and exhaustive brief, and I have given much time in reading the cases which he has cited. It would be impossible to refer to many of them and show their inapplicability. A few instances will suffice. The case of Straus v. American Publishers' Association, 177 N. Y. 473, 69 N. E. 1107, 64 L. R. A. 701, 101 Am. St. Rep. 819, was held to be in violation of chapter 690, p. 1514, of the Laws of 1899, in that the contract was in purpose and effect a restraint of competition in the sale of articles in common use, to wit, books. The case of Knight & Jillson Company v. Miller, 87 N. E. 823, was brought under a special statute of Indiana very broad in its scope. Bailey v. Association of Master Plumbers of the City of Memphis, 103 Tenn. 99, 52 S. W. 853, 46 L. R. A. 561, was an action between the association and a member, not a third party.

The case which comes nearest to the present controversy, sustaining much of the plaintiff's argument with strong reasoning, is Boutwell v. Marr, 71 Vt. 1, 42 Atl. 607, 43 L. R. A. 803, 76 Am. St. Rep. 746; but this was an action at law for damages, and not a suit in chancery for injunction. All of the cases cited by the plaintiff are of this nature. They bear upon the subject, but are not directly in point, being either actions under the federal anti-trust law (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), state statutes extending the remedy, if not the right, or else involving contracts and agreements the direct purpose of which was to control prices and create monopoly in articles in common use. I do not find one that gives or would give the plaintiff the right and remedy he seeks here.

It may be that the plaintiff and his associates will suffer some financial loss from this action of the Stock Exchange; but business is made up of gains and losses. Competition means selection, not inclusion; and, while there is always a wide opportunity for fairness and magnanimity, the courts interfere only when competition becomes combined force seeking another's injury or ruin. Legislation in some of the states pertaining to combination or association for trade or business is much broader than here; but I do not consider our law, which was chapter 690, p. 1514, of the Laws of 1899, applicable to this case.

For the reasons expressed, I shall deny an injunction.