PIRNIE, SIMONS & Co., INC., Plaintiff, *v.* RICHARD WHITNEY, as President of NEW YORK STOCK EXCHANGE, etc., Defendant.

Supreme Court, New York County, August 26, 1932.

*David L. Podell* [*Mortimer Hays, Benjamin S. Kirsh* and *Charles E. Rhodes* of counsel], for the plaintiff.

*Carter, Ledyard & Milburn* [*Roland L. Redmond* and *L. Randolph Mason* of counsel], for the defendant.

BLACK, J. In this case, which has been presented with great ability by counsel on both sides, plaintiff seeks to restrain and enjoin the New York Stock Exchange and its members, *pendente lite*, from continuing to enforce an order or resolution adopted by the governing committee of said exchange on June 22, 1932. The

plaintiff contends that the effect of this resolution is to boycott it by means of the concerted refusal on the part of the members of the Stock Exchange from dealing with plaintiff, whose business requires that it purchase from time to time stocks and securities in substantial amounts procurable only through members of the exchange. The facts so far as plaintiff's business dealings with the members of the exchange are concerned show that it is engaged in the business of purchasing, selling and dealing in securities as principal and agent, under a plan by which it markets the securities in " packages." This plan consists in purchasing in large blocks, through the members with whom plaintiff had accounts, securities listed on the exchange, and assembling a diversified selection of twenty-five or fifty different stocks. This package sale was advertised as " portfolios." Plaintiff groups the various stocks into these portfolios and offers them to the public for a fixed price, so that a purchaser desiring to take a portfolio of non-paying dividend stock may purchase one share of stock in each company in the group of twenty-five or fifty. There was also a group or portfolio of dividend-paying stock which was advertised by the plaintiff to purchasers. Plaintiff offered four different portfolios. Three of these had a group of twenty-five corporations and one portfolio had a group of fifty corporations. Portfolio No. 1 is described as " baby " investment. In this group the circular of the plaintiff details " net current asset value $208, book value $665, offering price approximately $100." The second group is detailed as "net current asset value $294, book value $523.93, current yield approximately 9%, offering price approximately $250." Group 3 consists of fifty stocks and details " net current asset value $791, book value $1,714.00, current yield approximately 7%, offering price approximately $450." Group 4 consists of twenty-five stocks and is detailed as " net current asset value $381.95, book value $886.01, current yield approximately 8%, offering price approximately $800." The offering price, however, of each group is subject to the following exception: " This price will vary each day with the market fluctuations of these stocks. It is based on New York Stock Exchange closing 'asked' prices plus the odd-lot differential, brokerage and transfer charges." The plaintiff also by the circular advertisement advises the proposed purchasers as follows: " For the convenience of our customers who purchase these portfolios from us we agree that in the event they wish to sell them that we will buy the portfolios from them at the current bid price on the New York Stock Exchange without brokerage charges. This agreement is good for one year from the date of the purchase of each portfolio." The plaintiff points out that the plan of the plaintiff

is not an investment trust, either fixed or management, nor a trust of any kind. There are no trustees or trust agreements. The stock you buy is delivered to you and registered in purchaser's own name, and he receives any dividends paid direct from the corporations. Plaintiff explains that the stocks included in group or portfolio No. 1, " baby investment," are at present non-paying dividend stocks; those included in portfolio No. 2 are dividend paying. The shares included in portfolio No. 3 are approximately half dividend paying and half non-paying. The plaintiff avers that the entire list represents a well-selected cross-section of American industry. All of the shares included in these so-called portfolios are listed on the New York Stock Exchange. The average of each portfolio is selling at less than the net current asset value after all commissions have been paid. The plaintiff also states that " in addition to selling units in particular portfolios selected, we have, whenever requested, assembled for customers their own selection of stocks." Portfolio No. 1 includes such stocks as Alleghany Corporation, American and Foreign Power Company, Inc., American Radiator and Standard Sanitary Corporation, Baldwin Locomotive Works, Curtiss-Wright Corporation, Fox Film, International Telephone and Telegraph Company, Montgomery Ward, Radio Corporation of America, Remington-Rand, Shell Union and Vanadium Corporation. Portfolio No. 2 includes such stocks as Allis-Chalmers, American Power and Light, Burroughs, Canada Dry, Consolidated Cigar, Electric Power and Light, General Electric, Gold Dust, International Cement, P. Lorillard, Nash Motors, Standard Gas and Electric, Texas Corporation, United Corporation and Zonite. Portfolio No. 3 includes Adams Express, Anaconda Copper, Atlantic Refining, Bethlehem Steel, California Packing, Chrysler Corporation, Colorado Gas and Electric, Consolidated Laundries, General Motors, Kelvinator, Lehn & Fink, National Cash Register "A," New York Central, New York, New Haven and Hartford, Northern Pacific, Pennsylvania Railroad, Philadelphia and Reading Coal and Iron, Pure Oil, Southern Pacific, Western Union, Wabash Railroad, Worthington Pump and Yale & Towne. Portfolio No. 4 (dividend paying) consists of Allied Chemical and Dye Corporation, American Telephone and Telegraph, Borden, Colgate, Palm Olive-Peet, Continental Can, Dupont, Eastman Kodak, General Electric, General Foods, Gillette Safety Razor, International Harvester, Kroger Grocery Company, Lambert Company, Loew's, Inc., R. H. Macy & Company, National Biscuit Company, Otis Elevator, Penney Company (J. C.), Public Service of New Jersey, R. J. Reynolds Tobacco Company, Texas

Corporation, Union Carbide and Carbon, United Gas Improvement Company, Woolworth, and Wrigley & Company.

Plaintiff alleges that this plan has been received very favorably throughout the country, that units of stock have been purchased for investment by people who apparently believe that these shares of stock, held over a long period of time, will ultimately be worth many times their present cost, as indicated by the fact that a very large number of purchasers have had the shares of stock registered in the names of children intending thereby to hold them for a very long period of time for permanent investment. In addition the plaintiff furnished a "watching service," that is, the plaintiff watches the respective values of the stock purchased in each portfolio and keeps the purchaser informed of the advances in price from time to time. It is claimed by the plaintiff that various companies charge for this service fees of $50 to $500 per year. The defendant, the New York Stock Exchange, on or about June 22, 1932, through its governing committee adopted a resolution which was given newspaper publicity and which was sent to all members of the exchange. It reads:

"New York Stock Exchange, Governing Committee. June 22, 1932. Statement regarding association of member firms with so-called 'Unit' or 'Group' plans of stock selling. Comparatively recently, plans have sprung up for marketing securities in packages. Usually, the common stocks of from 15 to 25 companies are included in such a package, which consists of from one to five shares of the stock of each company so included. The shares so sold are registered in the name of the individual purchaser, delivered to him, and no trusteeship is involved. In marketing such shares it has been customary to add to the round lot price of each share, the odd lot differential, transfer taxes, and, in addition, a minimum charge on the shares of each company involved in the offer. Such of these plans as have been examined by the stock exchange are subject to one or more of the following criticisms: (a) In the case of low priced shares, the minimum charge for services to the purchaser is out of proportion to the worth of the services. In some instances the total cost to the purchaser exceeds 40 per cent of the round lot price of the shares included. A like charge in the event of a resale means that the purchaser will suffer a loss unless there is an increase of more than 80 per cent in the market price of the lot. (b) In some instances circulars purporting to describe the plans conceal from the investor the relatively heavy charges included and are in other respects misleading. (c) In instances where the number of shares of each corporation in a block is very small, operation is wasteful because of excessive transfer charges,

undue costs of dividend payments, notices of stockholders' meetings, etc., as well as prohibitive costs of administration in case of the death of individual stockholders. (d) Many of the plans offer no dividend paying stocks and are speculative, while exacting charges which materially lessen the opportunity of speculative gain. For the foregoing reasons the New York Stock Exchange forbids the association of its members or member firms as principals, or in connection with plans sponsored by non-members, with any such 'Unit' or 'Group' sales plans, excepting to the extent that the committee on stock list will be willing to consider and pass upon membership association with any plans involving the following features: 1st. At the time of initial offering the total price of the package to the investor, including charges, must be not less than $500. 2d. There must be reasonable diversification. 3d. Not less than five (5) shares of the stock of any one company must be included in such offering. 4th. The total charges in addition to the round lot price of the included shares must not be in excess of 10 per cent of such round lot price. This charge must include odd lot differentials, commissions, transfer taxes, transfer charges, if any, and costs of distribution. Members and member firms are notified that any distribution of securities by them on a commission basis must adhere in substance to the features respecting charges set forth above. By order of the Governing Committee, Ashbel Green, Secretary."

It is claimed by plaintiff that the exchange, in connection with said resolution, has written to all the security commissions, the so-called "Blue Sky Commissions" of each of the forty-eight States, calling attention to said resolution, and requesting their investigation into sales by brokers attempting to engage in such transactions in such States and have sent letters to the members of the exchange not only calling attention to the resolution, but construing it and specifically forbidding their purchasing stock to be used in connection with any such unit selling plan. It is quite apparent, therefore, that the sales plan of the plaintiff does not comply with the rules prescribed by the exchange for the guidance of the members thereof. The plaintiff shows that subsequent to the adoption of the aforesaid resolution by the exchange it was advised by Ladenburg, Thalman & Co., of No. 25 Broad street, with which concern plaintiff was attempting to continue to do business, that the exchange would not allow them to handle the plaintiff's account, as they had knowledge that plaintiff was going to dispose of the shares purchased in one-share lots, and accordingly said concern refused to accept such order or to do business with plaintiff. In the correspondence of plaintiff with

such brokers which is made part of the moving papers, a letter is particularly referred to in which said brokers stated that they "were utterly helpless in endeavoring to fulfill your wishes," and under date of July 6, 1932, plaintiff was, by Ladenburg, Thalman & Co., a member of the exchange, requested to withdraw its account, despite the fact that there was with said broker approximately $200,000 on deposit guaranteeing it. Plaintiff has taken up with other brokerage houses the matter of buying on their plan, and in each case the broker, in view of the resolution of the exchange already quoted, has refused to deal with plaintiff. Notwithstanding the willingness of some of such brokerage houses to do business with plaintiff, they are obliged by the rules of the exchange and the resolution in question from proceeding further. It is not disputed that by section 7 of article 17 of the constitution of the New York Stock Exchange, the violation by any member of this resolution subjects such member to suspension or expulsion. Plaintiff claims that this constitutes a boycott against it. The purpose and effect of the resolution is to prevent plaintiff from carrying out through the exchange the plan of sales referred to. Plaintiff shows that it is impossible to make purchases of stocks except through the exchange and that because of the action of the exchange it has been deprived of conducting its business which it alleges is proper and legal in all its methods and does not violate any law or ordinance in the manner of conducting its sales. The plaintiff, of course, is not a member of the exchange and must necessarily do business with brokers who are members. It insists that the resolution of the exchange referred to is the exercise of an arbitrary power to interfere with the plaintiff in its business, and is in restraint of trade, as it compels purchasers of stock to comply with the rules of the exchange and in the quantities suggested by it. Plaintiff complains that it is no concern of the exchange how the profits of the plaintiff are arrived at or in what proportions the stock of each company is sold by them in groups. It says that in the circumstances the exchange cannot take upon itself to inquire into the question of whether or not the plaintiff is taking excess profits from the customers, and that if there is any fraud or deception practiced upon the public, which they say there is not, the public officials of the State are the only officials who can inquire into such matters. Plaintiff says it has complied with every requirement of the State Attorney-General's office regulating the manner of offering shares for sale. Defendant denies that plaintiff's plan has the approval of the Attorney-General. Plaintiff says that the exchange cannot put its stamp of disapproval upon its

business because the rates which plaintiff charges are more or less or different from the charges which their own members make. Plaintiff then suggests that the motive for the adoption of the resolution by the exchange is immaterial so long as it is intended to constitute and does in fact create an effective boycott, and that the continuance of the resolution is illegal and constitutes an actionable conspiracy. The sales of stock which are made in lots of less than one hundred shares are called "odd-lot" sales. Pursuant to the rules of the Stock Exchange they are made through odd-lot houses. (Plaintiff claims there are but four of these houses named in the affidavits.) It is claimed that these odd-lot transactions constitute a very substantial part of the business of the exchange, and plaintiff goes so far as to estimate that in its opinion one-third of the business of the exchange is done through these members. The rules of the exchange provide that in sales of odd lots the minimum purchasing charge is $1. Members are allowed to charge a maximum of $5, but the general practice has been to charge a minimum of about $2.50 on each individual purchase or sale, although some of the brokerage houses charge up to $5 commission on such sales. Plaintiff claims that these odd-lot houses exercise a powerful influence upon the transactions of the exchange, that each one of these houses has at least one of its members represented on the board of governors of the exchange, and in addition that all of them have a great number of seats on the exchange, as well as relations with numerous brokers not members of their firm who have control of seats on the exchange. Plaintiff then sets forth an analysis of the figures of the shares of stock in portfolio No. 1 (the baby investment), and this is selected for analysis by plaintiff because it says it is the principal selling unit of their business. The analysis of such stocks shows that they are being sold to the public at a charge of $42.62 over the quoted market price of the stocks in question. This $42.62 is made up as follows:

Commission on purchase of stock, $2; dealers' commissions (retail dealers), $15; reserve for repurchase losses, $5; reserve for advertising and printing, $10; banking collection charges, $3.12; tax stamps, $2 — $42.62, leaving a gross profit of $5.50 to cover all other items of salary, overhead, administration and profit.

Plaintiff then alleges that if the purchaser were to purchase these twenty-five shares directly through a broker, the cost to him over and above the market would be as follows:

1. Assuming the minimum charge of $1 per share were made by the broker, then the total charge would be $30.12, which is made up of $25 commission, $3.12 odd-lot differential and $2 in stamps.

2. Assuming the customary charge made of $2.50 per share, then the total charge would be $67.62, consisting of $62.50 broker's charge, $3.12 odd-lot differential, $2 in stamps. If the charge were over $2.50 then of course the total charge would be proportionately in excess of $67.62.

The analysis, plaintiff says, of these two figures, therefore, shows that the charge which is being made by plaintiff is twenty-five dollars less than the charge that would be made under the prevailing practice for the sale of such shares, and twelve dollars more than the minimum charge which would be made if such stocks were sold in accordance with the minimum requirement of the exchange (which plaintiff says is not generally done). The plaintiff as part of its plan makes in connection with all of its sales the offer to buy such portfolio at the current bid price on the exchange without brokerage charges within one year from date of the purchase of each portfolio. Under this plan of resale plaintiff claims it would save the purchaser considerable money, in addition to the service with which plaintiff keeps the customer advised as to the stock statistics during the year. The plaintiff purchases stock in lots of 2,500 to 5,000 shares at a time, these purchases being always at least 100 shares of stock of any particular stock purchased, in order to avoid odd-lot charges and to allow plaintiff the differential upon which to conduct the business. Plaintiff claims that a large amount of capital is tied up by the purchase of these stocks and certain risks involved, and that the business of plaintiff would naturally adversely affect the profits and business of the odd-lot houses. Plaintiff goes so far as to state that it has been advised from reliable sources and believes that the true intent and purpose of the adoption of the resolution of June 22, 1932, was to protect the interests of these odd-lot houses which would otherwise be deprived of substantial odd-lot purchases through the vast sales of stock in single units to the public contemplated under plaintiff's sales plan. The plaintiff then argues that the resolution adopted purports to prevent excessive charges being made to purchasers of these units and gives various alleged reasons for its adoption, but that it is not intended to prevent this. The resolution in no way is directed, urges plaintiff, against charges still being made by member firms of the exchange in connection with the purchase and sale of odd lots. These charges, they say, in view of the present market prices, are in many instances one hundred per cent or a percentage far exceeding that amount; that a very large percentage of these charges for purchase and resale of stock is far in excess of the eighty per cent figure referred to in the resolution. Plaintiff also says that the clause in the resolution which requires the total

charge not to exceed ten per cent of the round-lot price would make prohibitive the sale of units in which single shares of a company are being offered by it. Plaintiff says that in its experience and the experience of others and of banking institutions, investors of this type want diversification, and where they are offered five shares of one company it is more difficult to make a sale than in offering them one share of five companies, and that the requirement by the exchange resolution of units of not less than $500 and to have not less than five shares of stock of any one company apart from the percentage provision, makes impossible the successful and profitable sale of units under any plan similar to plaintiff's. Plaintiff claims that the purpose of the exchange resolution is not to regulate the charge to the public in sales of odd lots, but is to prevent legitimate competition with odd-lot members of the exchange; that the intent and purpose of the resolution is to restrain and prevent competition in this State in the supply of such stocks and prevent free pursuit of a lawful trade or occupation, to create an unlawful monopoly in the sale of shares of stock in small lots, and to commit acts injurious to trade or commerce, and that the resolution constitutes an unlawful conspiracy and boycott of plaintiff in violation of the provisions of the General Business Law, and particularly section 340 thereof, of the Penal Law, particularly section 580 thereof, and in general is violative to the common-law principles of fair and free trade and free and open market. The plaintiff then narrates the effect caused by the refusal of the members of the exchange to do business with it in accordance with its plan, and seeks to enjoin and restrain the defendant, during the pendency of this action, from carrying into effect said resolution of June 22, 1932. The defendant emphatically denies most of these allegations, and alleges with reference to the resolution in question here that the present form of this resolution was adopted by the governing committee on May 7, 1931. The immediate cause of its adoption was the rapid development in this country of fixed investment trusts. This type of security was not of the kind that could properly be listed upon the exchange. That, nevertheless, many members of the exchange were actively engaged in the organization and management of fixed investment trusts and a large number of members of the exchange participated in the distribution of their trust certificates. That an examination of the methods of these trusts disclosed certain grave abuses, including the charging of excessive amounts for services rendered, which charges were, in many instances, concealed so that it was almost impossible for investors to determine the amount which they were paying in order to participate in such trusts. That in the opinion of the

governing committee, the participation by members even in the distribution of fixed investment trust certificates where excessive charges were being made was certain to bring merited criticism upon the exchange, and would ultimately tend to injure the good repute of the institution with the public. For these reasons, the amendment to the rules was adopted May 7, 1931. The committee on stock list promptly adopted requirements specifying conditions to be met by fixed investment trusts before the committee on stock list could find that the association of members with them was unobjectionable. Defendant presents a printed circular with the objections of the exchange to this class of stock certificates, wherein is plainly set forth the conditions under which members are permitted to deal in this class of securities. That in May, 1932, the attention of the committee on business conduct was called to the development of a new method of stock distribution under which investors were urged to buy one share of a designated number of listed stocks. These so-called unit or group plans were, in many instances, similar to the fixed trusts, and the governing committee felt that the same abuses which had existed in the fixed investment trust field prior to the action taken by the exchange in 1931, would occur in connection with these new plans. Under date of May 16, 1932, the governing committee of the exchange ruled that such unit or group plans were so similar to fixed investment trusts that they were subject to the provisions of section 2 of article XIV of the rules. A copy of the ruling of May 16, 1932, reads as follows:

" New York Stock Exchange Committee on Business Conduct. May 16, 1932. To the Members of the Exchange: The attention of the Committee on Business Conduct has been called to the practice of suggesting to customers the purchase of units of one share of a number of prominent stocks. In some instances, these suggestions are made in connection with a plan in which a particular number of selected stocks are purchased. Such recommendations when they contemplate the actual purchase of securities on a commission basis are unobjectionable. Where, however, such plans contemplate the sale of securities to the public by members of the Exchange, as principals, or where non-members of the Exchange are sponsoring such plans, the Governing Committee has ruled that such arrangements are in the nature of investment trusts and subject to Section 2 of Chapter XIV of the Rules adopted by the Governing Committee pursuant to the Constitution, which reads as follows: Section 2. No member or firm registered on the Exchange shall be associated with an investment trust, whether management, restricted management or fixed type, either by

participating in its organization or management or by offering or distributing its securities, unless the Committee on Stock List shall have previously determined that it is no objection to such association and shall not have changed such determination. Until such plans are approved by the Committee on Stock List in accordance with the foregoing rule, members shall not be associated with them either by participating in their organization or management or by offering or distributing such securities. Ashbel Green, Secretary."

The defendant further asserts that almost immediately thereafter the committee on stock list investigated a number of these plans and discovered that grossly excessive charges were usually being made to customers of plans similar to plaintiff's. These investigations further disclosed the fact that due to the extremely low price of certain securities, the purchase of one share of stock was economically wasteful to the customer. That the actual out-of-pocket cost for the issuance of a stock certificate is usually in excess of fifty cents. Where stock is selling for two dollars or one dollar, or even at a fraction of a dollar, it is obvious that it is economically unsound for a corporation to issue a large number of single share certificates at an expense of more than fifty cents per certificate. Therefore, from the point of view of all listed corporations whose securities were selling at very low prices, the development of these plans represented a real financial danger. Furthermore, the defendant alleges, if the holder of a single share of a low-priced stock should die, the cost of securing the necessary approval of tax authorities to the transfer of certificates, together with the costs of filing a certified copy of the will and proof of the appointment of executors or administrators, all of which documents must necessarily be filed with the transfer agent at the time that securities registered in the name of a decedent are transferred, would far exceed the value of the stock itself. Inasmuch as practically every group or unit plan considered by the committee on stock list contained a large proportion of low-priced stocks, the committee was convinced that the distribution of single share certificates by this means would not only be wasteful as far as the funds of the companies were concerned, but might also result in a complete loss to the investors. The committee on stock list, therefore, rules that any such unit or group plan should consist of units of at least five shares of each company and a sufficient number of stocks to give the investor a reasonable diversification of risk. But to prevent the inclusion in such plans of only very low-priced stocks it provided that the total initial offering price must not be less than $500 for any single unit. Finally the committee provided

that the total charges to the customer of stocks sold under plaintiff's plan should not exceed ten per cent of the price at which the securities were quoted on the exchange. This percentage was considered reasonable in view of the experience of the committee with fixed investment trust certificates where the investors received the services of a trustee to hold their certificates and also the supervision of the sponsoring organization. The committee on stock list made a report to the governing committee, and under date of June 22, 1932, the governing committee adopted the conclusions of the committee on stock list and issued a statement to the members of the exchange which prohibited the association of members of firms as principals or in connection with plans sponsored by non-members with any such group or unit plan, unless the plan meets the conditions considered by the committee on stock list necessary for the protection of investors. It further provided that members and member firms, in the distribution of securities on a commission basis, must adhere in substance to the finding of the committee on stock list in regard to the limitation of the amount of charges. The defendant by its president charges misstatements in the moving affidavit.

It is unnecessary to go at length into the motives of the defendant in its publication of the resolution of June 22, 1932, because the court assumes that the defendant throughout has been guided at least in part by altruistic motives and by what it believed to be the proper precautions for the benefit of the investing public, even if the passage and enforcement of the resolution would undoubtedly advantage its odd-lot members through whom members and non-members customarily deal in odd-lot securities. But we should no more expect altruism between buyers and sellers than we should go into the motives of either party to this controversy. One man's motive, both in and out of the exchange, may be another man's excuse. Besides, men are fallible, and are often, with the purest motives, honestly mistaken. Equally true is it that all classes of men do not always know what is best for others, and do not always know what is best or most profitable even for themselves. Motives in this case are, therefore, only valuable in discovering the purpose of the resolution to which plaintiff objects. Further than that, neither the motives of the plaintiff nor of defendant need be considered. In *Peekskill Theatre, Inc.*, v. *Advance Theatrical Company* ([1923] 206 App. Div. 138) the court quotes as follows: " It is claimed that there is no malice here shown, * * * but the law * * * will grant reparation in damages, or an injunction * * *." In *Sanitary Manufacturing Company* v. *United States* the court says that " the prohibitions of

the statute cannot be evaded by good motives." Mr. Justice BRANDEIS of the United States Supreme Court said in *Chicago Board of Trade* v. *United States* (246 U. S. 231): " This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." The same court said in *United States* v. *Reading Co.* (226 U. S. 324): " Of course, if the necessary result is materially to restrain trade  *  *  *, the intent with which the thing was done is of no consequence." In *Kellogg* v. *Sowerby* (190 N. Y. 370) the court said (at p. 375): " *  *  *  We do not think that good motives on the part of those who enter into a combination in restraint of trade save it from the condemnation of the law of this State. (*People* v. *Sheldon* [139 N. Y. 251].)  *  *  *  The parties to an agreement of such character. may have honestly believed that it would be beneficial instead of injurious to commerce does not render it legal. The law denounces it if it is designed to prevent competition and will have that effect whatever the intent of the parties." In *People* v. *Morrison* (98 Misc. 555, on p. 557) the court said: "Where a defendant is charged with a violation of the Donnelly Act, the question of his motive, intent or good faith is immaterial."

But regardless of motives on either side, which are no better or no worse than the motives of other business men similarly circumstanced, the court must consider the potentialities of the resolution of June 22, 1932. It seeks to govern in an unlimited way the actions of men with whom it has no direct contact, and seeks to set up for the investor a guardianship which he has not requested, and which he might or might not consent to if consulted about it. There only remains to be considered to what extent the resolution in question is a violation of plaintiff's rights, and its legal effect upon it and others who may be similarly situated. Defendant has called attention to the action of the Attorney-General in dispensing with the method of lithographic reproduction of stock certificates, and this official's action seems to have been well directed. There are also criticisms which might well be made concerning plaintiff's method of advertising, by which that part of the public not entirely familiar with stock transactions might be deceived. Where the plaintiff advertises to the public the highest price the stock brought during any previous period, it should, of course, give the then present market price on the exchange. Mr. Whitney's affidavit on page 18 sets out that plaintiff in some cases uses the high price of a common stock (for comparison purposes) when the preferred stock is included in plaintiff's portfolios. Likewise, where there have been rights, a stock dividend or a split-

up of stock since the date of the high prices quoted by plaintiff, or a receivership of the company, this should be set out in plaintiff's advertising. This frankness would be in line with the amendments recently instituted by the exchange in regard to the use of customers' stock to make delivery under short sales, and would likewise be in line with the demand of certain congressmen that every " short sale " should be published on the ticker and otherwise as a " short sale," both of above being in the interest of fair play. Certainly if the present market value of the stock in the portfolios is not given there can be no point in advertising the highest point it sold at during a well-directed buying hysteria created by men who had stocks to sell.

If the suggestions first above made were carried out there could not be so many charges by defendant of bad faith on the part of the plaintiff, nor could it be said that those who bought such packages as plaintiff seeks to sell had not been fully advised of the market value.

Plaintiff must pay salesmen a commission. Also it may be necessary to employ those of the high-powered variety, but I can see nothing illegal in this provided the buyers are not deceived. Sales resistance cannot be created by Stock Exchange resolutions, nor even by judicial decree — it can come only from experience. But if it be conceded, which the court thinks it must under the decisions, that it is beyond the power of the exchange to say that their members cannot buy for their customers unless the customers sell at prices set, and under conditions fixed by the exchange, then the questions of high-powered salesmen and exorbitant commissions paid them are immaterial. There are suspicious people who believe this is not the first time high-powered salesmanship, and indeed the methods of super-powered salesmen, have been employed in the unhappily not too remote past, and the hyper-suspicious are still leery of what they hear or read about the market. None of what has occurred in the market in this respect can be charged to the exchange as such. Some laymen have almost reached the point where they will not believe all they read in all the financial pages because they have almost begun to suspect that the information was put there by profoundly ignorant men, or by men who were not motivated by the highest altruism. This class of over-suspicious person may not be entirely cured of taking advice in allopathic doses, but they have at least come to have a homeopathic slant. They are not, therefore, wholly convinced that any special classes of men in the financial world are their " brothers' keepers."

The distinction must be strictly drawn between the exchange,

the creature, and its members, the creators. According to article I of the constitution of the exchange, its objects are " to furnish exchange rooms and other facilities for the convenient transaction of their business by its members; to maintain high standards of commercial honor and integrity among its members, and to pro- mote and inculcate just and equitable principles of trade and busi- ness." Since this statement of objects, the exchange has become the greatest stock mart in the world.

Before stocks can be sold, these stocks must have been subjected to the closest scrutiny of a highly conscientious, exceedingly able, and painstaking official. That official now is the maker of one of the affidavits, than whom probably no man is better qualified for his work. Mr. J. M. B. Hoxsie, executive assistant of the committee on stock list, attempts to go as thoroughly as is humanly possible into the claimed financial condition of the companies which seek to list their stocks for purchase or sale on the exchange. His reports are rejected or approved by his select and presumably expert committee, after which the stocks on the floor are finally listed or rejected. When listed, they are dealt in on the floor by the members of the exchange.

The exchange, as such, has no concern with transactions on its floor except to see that they are handled in a manner that will not bring such criticism upon its members as would destroy their business, and thereby destroy the exchange. After the trades are made on the floor, a great many of them are " cleared " through the Stock Clearing Corporation, a separate corporation which is owned by the exchange. Here daily the debts and credits for the day before are fixed. By an ingenious and as defendants claim an unobjectionable, system of cancellations, only net balances or net shares of stock due are paid or delivered. The exchange as such is not consulted by customers, gives no advice, and assumes no responsibility further than ruling as to when or how trading shall be done by its members. It directs the delivery of actual stocks as the result of actual sales, and it directs how brokers may, when their customers sell something they do not own (with the object of depressing the market, or in the disinterested belief that the market is going down), go to the " loan crowd " on the exchange and borrow stocks to deliver to those to whom they have sold, without having the stocks to deliver. The exchange also directs at what time and how these sales of something their customers did not own must be delivered in place of the stocks used to make delivery. This is done by borrowing, usually from a third party, the stocks the customers have sold when they did not have them to sell. A " short sale " is closed or " covered " by the broker

acting for the customer going into the open market and buying stock. The stocks thus finally bought when a " short sale " is " covered " are returned to the broker who loaned the seller the stock to deliver under the sale he made when he did not own it. The exchange and the Stock Clearing Corporation in all these things are merely acting as the machines that almost automatically carry out the wishes of the broker representing the customer. There are 124 pages of the exchange constitution and 34 pages of index. Article XIX of the rules provides how much the broker may charge as a minimum for his services to his customer. Except, therefore, for facilitating all these operations and making them public, and preventing the claimed unnecessary delivery of actual stocks, and providing the machinery for facilitating the sale of stocks, the customer does not own that nearly everything that the exchange does could be done by the broker himself. The ethical standards of the exchange are perforce the ethical standards of its members. Its standards rise no higher and sink no lower than their standards. It is the member who must create and maintain high standards if he would permanently succeed, because his is a fiduciary relation to his customers. So that if the practices of any proposed customer are distasteful to the broker member he must correct such practices, not the exchange.

In this case the exchange says, in effect, we want to safeguard the public. The public has not asked them to do so. Indeed, assuming that they had or would read the resolution of June 22, 1932, that part of the public which would buy these " portfolios " by such buying would be in effect replying " We don't want you to safeguard us." The plaintiff insists that neither it nor its customers have selected the exchange as such guardian. They go further and claim that their package sales will give the sale of stocks such a " spread " among so many individuals that manipulation and especially " short selling " will be made more difficult. This seems plausible, but it has been specifically denied by the exchange. The court cannot, therefore, consider the effects of trends which are alleged by one side and denied by the other. But the court has been unable to find a case where a prohibition such as that contained in the resolution of June 22, 1932, has been sustained for the benefit of one who has not sought it. The injunction *pendente lite* will be granted in this case, and it would be just as quickly granted if a customer or group of customers should attempt to prohibit sales on the exchange unless such sales reached a certain minimum.

On the question of commissions the defendant refers to the rules of the Stock Exchange, which provide that in sales of odd lots the

minimum purchasing charge is $1. Members were allowed to charge a maximum of $5, but the general practice has been to charge a minimum of about $2.50 on each individual purchase or sale, although some concerns charge up to $5 commission on such sales. Defendant calls attention to article XIX of the constitution of the exchange, which prescribes the commissions which must be charged by members. All of the commissions are minimum commissions. There is no rule regarding the maximum commission. The minimum commissions on transactions in stocks for non-members of the exchange are graduated in accordance with the price of the security purchased. There is no fixed minimum as to securities selling for less than 50 cents per share. The minimum commission for stock selling between 50 cents and $1 is 3 cents per share; between $10 and $25, $12\frac{1}{2}$ cents a share; between $25 and $30, 15 cents per share; between $50 and $75, $17\frac{1}{2}$ cents a share and upward. It is further provided that in all transactions which involve an amount of $15 or more the minimum commission shall not be less than $1.

Inasmuch as all of the securities included in portfolio No. 1 (baby investment) are selling for less than $15 a share, the requirement that the minimum commission of $1 be charged has no application whatsoever. On the closing prices of July 14, 1932, the minimum commission would have to be $1.78$\frac{1}{2}$ under the constitution of the exchange. This minimum would hardly compensate the members for the purchase of twenty-five separate stocks, and as the constitution of the exchange fixes only a minimum commission, the members of the exchange would be entitled to charge a higher commission by agreement with their customers. It is quite apparent, therefore, that the claim that the exchange would charge a minimum of $2.50 to $5 per transaction on an order for the purchase of twenty-five stocks is not quite correct. With reference to the ten per cent fixed by the committee on stock list under the resolution of June 22, 1932, the defendant claims that there is no basis for the claim of the plaintiff that the costs to the public of purchasing the securities comprising portfolio No. 1 (baby investment), offered by the plaintiff, would amount to $30.12 as a minimum and $67.62 as a maximum. The securities in said portfolio are selling for approximately $80 and under the resolution of the governing committee the maximum charge would, therefore, have to approximate $8. The defendant compares the prices of the stocks in portfolio No. 1 and claims that an analysis of them indicates that such stock is being sold by the plaintiff to the public at a charge of $42.62 over the quoted market price. It points out that on the basis of the closing prices of July 14, 1932 (using

the *bid* prices in the case of two stocks which did not sell on that day), the securities included in that portfolio were worth $77.62½. On the morning of July fifteenth said portfolio was being offered to the public at $123. This represents a difference of $45.37½. This discrepancy the defendant adds is probably due to the fact that the so-called "quoted market price" is probably based on the closing "asked" prices. That it is found, using this basis, the securities in said portfolio were worth at the close of July 14, 1932, $80.62½. The method of using the asked prices instead of the bid price is criticized, and if that is so, the criticism is justified. In testing the value the actual sale or bid price should be used as the test, rather than the asking price. It is pointed out by defendant that this method of valuation causes a substantial difference in price in portfolio No. 1 of almost four per cent of the total cost. The defendant then points out the charges made by the plaintiff for various items, and concludes that after all additions to the stock are made it represents nearly twenty per cent of the actual cost. The defendant also presents proof by affidavit of various broker members of the prices which would be charged in the purchase of stock in portfolio No. 1. In some instances it is at variance with the claims of the plaintiff. The papers on this application do not indicate to my satisfaction that the plaintiff has proceeded to sell stock in a fraudulent manner. Even the belated action of the Stock Exchange to make inquiry after the trust certificate method had run its course is commendable and it is never too late to act in the public interest. The present plan, however, in my opinion cannot be compared with the investment trusts plan which was investigated by the Stock Exchange, but too late to protect the public from loss of money. Only the public and not the Stock Exchange is concerned as to the manner in which the portfolios of stock may be purchased. So long as there is no fraud and no concealment of any facts that would make the public hesitate to buy, I cannot see how the defendant is in anywise concerned, even though, as in the instant case, it says it may have been at least in part prompted by proper motives to protect the public in any plan which does not meet with its approval. The most that can be urged by the plaintiff in this regard is, *first*, that defendant may not always have been right, and, *second*, that it has not always been as alert to protect the public as the public might have wished, and *third*, that the defendant's present solicitude for the customer is belated.

The resolution attempts to fix the number of shares that shall comprise a group or plan and the minimum amount for which such stock is sold, but the court believes that is of no con-

cern to the defendant as long as the plaintiff is willing to pay to the members the commissions fixed by the board. The suggestion that purchase and sale may be made through banks and trust companies is not practicable as matters are at present handled (nor might it be permissible within the terms of the resolution).

As to the laws which pertain to the facts in the instant case, the court approves the general proposition laid down in *Cohen* v. *Budd* ([1906] 52 Misc. 217; affd., 117 App. Div. 922) that " Stock Exchanges have the power to enact such rules and regulations concerning the government of their affairs as may be necessary to carry out their purposes, but such rules and regulations must not be contrary to the law of the land." So long, therefore, as the defendant does not transgress the rights and privileges of the public, the purposes of the association should be upheld. They have a perfect right as between themselves to ordain what shall constitute the ethics of the trade or profession. In the instant case, however, the plan proposed by the plaintiff is not to sell to the public an interest in a company or in shares of stock held by an investment trust in which they themselves have little or no choice of selection except to eliminate objectionable directors and officers who make the selection, or to purchase participating interests in bonds covered by mortgages on real estate, which even in good times may have been appraised far in excess of their true market value. The plan gives to the customer outright one share of each stock selected by the company and plainly indicated in the portfolio. The public is not buying a " pig in the bag " but stocks which they can find the market price of in the daily papers before buying and determine for themselves whether prospective development offers sufficient inducement for them to put their money in. The cost of sale on one share or one hundred shares, or the difficulty of transferring one share or one hundred shares to a legal representative in case the purchaser dies, is no concern of defendant. Some of the same expenses have to be incurred when stocks are bought by odd-lot brokers.

It matters not what the motives of the plaintiff may be as long as the public knows what it is buying. There can be no restriction imposed by the Stock Exchange in the buying in one share lots or five share lots. If the defendant had the right to place a minimum of quantity and price, it would have the right by the same token of authority, under the same reasoning, to protect the public at large from what it in its judgment deems improper practices, by imposing a maximum of quantity and price of such portfolio lots or groups. The defendant cannot restrict the purchase and the sale of stocks whether in single shares of one or whether they

be contained in groups or portfolios of one, five, ten or one hundred. This is beyond the power of the exchange, and it is likewise beyond its power to place a limit of value either on one share of stock or in blocks of five, ten or more, or whether they be in form of portfolios or groups. It is also beyond the powers of defendant to prevent the continuance of a proper and lawful business so long as the plaintiff conducts its business in a legal manner and without complaint from the buying and selling public, or from those officials elected to enforce either civil or criminal law who have power to stop any abuses or fraud. In *Peekskill Theatre* v. *Advance Theatrical Company* (206 App. Div. 138) the lower court's ruling denying an injunction was reversed, and the motion granted by the Appellate Division. " Both by the common law and by our statute a party is allowed free competition unhampered by the wrongful interference of third parties even for the purpose of securing greater profit to themselves." In the case of *Straus* v. *American Publishers' Association* (177 N. Y. 473) the court said: " The intended effect of this [that books would be sold to those booksellers and jobbers only who would maintain the net price of the copyrighted books for a certain period] is to prevent any dealer who is even suspected of selling copyrighted books at less than the net price from obtaining books at any price or any terms, whether copyrighted or not." The court declared such agreement " against public policy, illegal and void." To the same effect is *Sultan* v. *Star Company* (106 Misc. 43) and *Langley* v. *Furman* (132 id. 726). In the Supreme Court of the United States case of *Paramount Famous Lasky Corp.* v. *United States* (282 U. S. 30), the relief was granted although the lower court had found that " competition between the distributors has been promoted by the adoption of the standard exhibition contract [which plaintiff complained of], and that in many ways general trade conditions have been vastly improved," because the court said that the acts of the defendant were " all with the manifest purpose to coerce the exhibitor and limit the freedom of trade." The same doctrine was followed in *United States* v. *First National Pictures* (282 U. S. 44); *United States* v. *American Livestock Commission Co.* (279 id. 435); *Binderup* v. *Pathe Exchange* (263 id. 291) and *Eastern States R. L. D.* v. *United States* (234 id. 600). The latter case was decided five years after *Heim* v. *N. Y. Stock Exchange* (64 Misc. 529), relied on by defendant, which does not apply to the facts here. The *Heim* case came up before the very important amendment to the Donnelly Act in 1921.* In the *Heim* case the court said: " It would be illegal for them to agree not to transact any

---

* Gen. Business Law, § 340, as amd. by Laws of 1921, chap. 712.

business with him at all for no other reason than that they did not like him or his business, and it would be illegal for them to combine not to buy or sell for him while he was a member of any particular club * * * or political organization * * * but can they base their non-intercourse resolve upon the ground that the plaintiff belongs to and is actually engaged in building up and strengthening a rival to their detriment? I think they can. * * * ` If the combination not to do business with the plaintiff is for the purpose of injuring and destroying him, it is illegal." The other cases quoted by the learned counsel for the defendant are labor cases which do not apply, or are cases that were decided upon technicalities or points not applicable here. The court grants plaintiff's motion to the extent of enjoining the defendant from compelling its members to observe the resolution under the penalties prescribed by its rules, restricting the purchase and sale of securities in groups of twenty-five or fifty or any other similar amounts, on the basis of one share each, and so far as it restricts its members from taking orders to buy and/or sell in amounts less than $500 for such portfolio or group orders. The plaintiff to give a bond in the sum of $10,000. Settle order on notice.