## UNITED STATES v. ASSOCIATED PRESS et al.

District Court, S. D. New York.

Oct. 6, 1943.

364

Charles B. Rugg, of Boston, Mass., and John Henry Lewin, of Washington, D. C., for plaintiff.

Timothy N. Pfeiffer and Morris Hadley, both of New York City, for Associated Press et al.

Robert T. Neill, of San Angelo, Tex., for special committee of Associated Press members in smaller communities.

Weymouth Kirkland, of Chicago, Ill., for Chicago Tribune and Robert R. McCormick.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

### L. HAND, Circuit Judge.

■ This action comes before a special court, convened under § 28 of 15 U.S.C.A., upon a motion by the plaintiff for summary judgment. The complaint charged that the defendants had conspired to restrain and monopolize interstate commerce in violation of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and the Clayton Act, 38 Stat. 730, and prayed that they be enjoined. The particulars of the charge may be summarized as follows: (1) A by-law, restricting membership in the Associated Press—which we shall call AP—to such applicants as a majority of all the members may elect, and then only upon conditions which we shall describe later; (2) other by-laws, forbidding members of AP and their employees to communicate to anyone else any "spontaneous news", so-called, communicated by them to AP, and forbidding AP to communicate its dispatches to non-members; (3) the purchase by AP of the shares of a news picture company—Wide World Photos, Inc.—(this in violation of § 7 of the Clayton Act, 15 U.S.C.A. § 18); (4) an agreement of AP with the Canadian Press, a similar organization operating in Canada, by which each furnishes its news exclusively to the other. The defendants have answered, and much evidence has been taken in the form of interrogatories, admissions under Rule 36, examinations before trial, and affidavits. Upon all of these the plaintiff has now moved for summary judgment. Although upon such a motion we are confined to such facts as are not disputed, or as to which the dispute does not raise any substantial issue, for reasons that will appear we hold that a trial will not be necessary. The case is therefore in posture for final disposition both as to those matters as to which we decide in the plaintiff's favor, and as to those as to which we decide in the defendants'.

AP is a New York corporation organized in 1900, the successor of an Illinois corporation of the same name. It is not a profit-making company, but strictly co-operative, paying its expenses by assessments levied upon its members, and never declaring any dividends, although it has accumulated large assets. Its purpose, as its charter declares, is "the collection and interchange, with greater economy and efficiency, of information and intelligence for publication in the newspapers" of its members. The news which it gathers is of two kinds, domestic and foreign; and originally it relied for the first largely upon the interchange of news between members, the association acting somewhat as a clearing house. News gathered in this way on the spot—"spontaneous news"—is still sent by members to be properly edited at the central offices which then sends it out at large. In recent years, however, although news so collected still remains an important part of its dispatches, AP has itself set up so many collecting agencies that the importance of such news has much diminished. Similarly as to foreign news. Originally AP obtained this from collecting agencies abroad whose dispatches it received and transmitted to its members after proper editing. As it has grown in size, however, it has set up its own foreign agencies like its domestic ones, and has come to depend less and less upon independent foreign news gatherers.

Since the plaintiff's chief attack is upon the by-laws, we must state these in some detail; especially those governing the admission of members, which are the turning point of the whole action, as will appear. The earlier Illinois corporation did not admit any applicant over the veto of existing members with whom the applicant was competing (papers in the same "field" in the same city). AP changed this by giving power to the members at large to overrule such vetoes by a four-fifths vote. Very recently, and after the Department of Justice showed signs of moving against it, AP reduced the vote necessary to overrule a veto, and at present applicants can be admitted by a bare majority vote of all the members at large. Admission is, however, subject to certain conditions which we shall describe later—relaxed in one respect after this action was brought. The plaintiff argues from this progressive re-

treat, and from the paucity of admissions in the past that—whatever AP's present surface complaisance—experience proves that the majority always, or at least usually, will yield to the inevitable pressure of members in the same "field" in the same city, to resist the admission of competing applicants. We agree that, even though the by-laws were valid on their face, evidence, drawn from past practice, might be strong enough to justify the inference that they would be administered substantially as though they had not been changed; but we ought to make no such assumption upon a motion for summary judgment, for we should be deciding a controversial issue on which the defendants would have the right to a trial. Therefore we disregard all the evidence as to admission of members in the past; not because that is not pertinent, but because it is not persuasive enough to put the issue beyond substantial question. Nevertheless, although the defendants are entitled to have us treat the by-laws as they read, they are not entitled to have us assume that those motives will not be operative in their enforcement which ordinarily actuate human beings similarly situated.

Article II of the by-laws divides members into two classes: "regular", and "associate". Only the "sole owner of a newspaper * * * shall be eligible." Every applicant must, in his or its application, describe the "field"—that is whether a morning, afternoon, or Sunday paper—in which his or its newspaper is published, and must specify the newspaper which is to receive the service. A member ipso facto ceases to be such when he ceases to own the newspaper described in his certificate, or when that newspaper ceases regular publication. A "retiring owner may, however, * * * assign his or its certificate of membership to the succeeding owner of such newspaper and such succeeding owner shall thereupon become a member of the same class as the predecessor upon signing the roll of members" etc. "When a change shall be made in the ownership of any newspaper * * * the member may transfer his or its certificate of membership with his or its newspaper, and the new owner shall be constituted a member of the same class as the predecessor by virtue of such assignment."

Article III provides for the admission of members. The owner of any newspaper may be admitted by the affirmative vote of a majority of the "regular" members, voting in person or by proxy at a regular meeting or at a special meeting called for the purpose. "Where there are one or more existing memberships in the field (morning, evening, or Sunday) in the city in which an applicant has been so elected, he or it shall not be admitted to membership" except upon the payment of "a sum equal to ten (10%) per cent of the total amount of the regular assessments received by the Corporation from members in the field (morning, evening or Sunday) in the city in which the applicant has been elected to membership, during the period from October 1, 1900, to the first day of the month preceding the date of the election of the applicant." (Until an amendment was made in this by-law after the complaint was filed, it had provided that the sum must also not "be less than three times the current annual regular assessments"). In addition, "the applicant shall relinquish any exclusive right that he or it may have * * * to any news or news picture services * * * and when requested to do so by any member or members in the field in the city * * * shall require the said news or news picture services * * * to be furnished to such member * * * upon the same terms as they are made available to the applicant." The moneys paid by the applicant are to be distributed among the members "in the field in the city * * * in proportion to the regular assessments paid by them over the period from October 1, 1900." If any such member chooses to release ("waive") his share, the applicant's burden is reduced accordingly. An alternative method of admission is by the Board of Directors; but this is limited to "a field in a city where there is no existing membership," or, if there are one or more such memberships, to cases where the "members in such field and city shall have waived the payment, in whole or in part."

Article VII defines the rights of the members. The regular members alone may vote; associate members may attend meetings, but may not vote; each regular member has one vote by virtue of his membership, and additional votes—not more than forty for each member—reckoned at the rate of one vote to each $25.00 of the corporation's bonds which he holds. The board of directors determines the nature and extent of the news service to be received by a member. "The news service of this Corporation shall be furnished only to the members thereof, or to newspapers

owned by them and specified in their certificates of membership. A member shall publish the news * * * only in the newspaper, the language and the place specified in such member's certificate of membership and shall not permit any other use to be made of the news furnished."

Article VIII describes the duties and obligations of the members. "Each member shall take the news service of the Corporation and publish the news regularly in whole or in part in the newspaper named in the Certificate of Membership. Each member shall also promptly furnish to the Corporation * * * all the news of such member's district, the area of which shall be determined by the Board of Directors." "The news which a member shall furnish * * * shall be all such news as is spontaneous in its origin," but not any other news—especially no news "which has originated through deliberate and individual enterprise on the part of such member." "No member shall furnish * * * to any person who is not a member the news of the Corporation in advance of publication," or furnish any news to another member which AP is itself debarred from furnishing to that member. "No member shall furnish or permit anyone to furnish to anyone not a member of this Corporation, the news which he or it is required by the By-Laws to supply to this Corporation, or which he or it obtains from the Corporation or from any other member by virtue of his membership. Provided, however, that associate members may furnish or permit to be furnished to non-members, any news which they are required by the By-Laws to furnish to the Corporation."

At the present time, 1,274 newspapers are members of AP, of which 303 are morning, and 887 evening, papers. Of these, ninety-nine hold bonds in the amount of $1,000 or more, each of these having forty votes, as we have said. (These ninety-nine newspapers thus have nearly eighty per cent of the voting power). After receiving the news from its own agencies and elsewhere, AP edits it and by teletype transmits it to the members and to them alone. In levying assessments upon members it divides the United States into areas determined by cities, with a surrounding territory generally of not more than ten miles. The entire levy is allocated "fundamentally upon a plan of distributing the total cost * * * in proportion to the population served by each member." Each allotment is then divided among all the members in the same "field" and city in proportion to their number, not to their circulation. In the course of its existence AP has accumulated tangible property, estimated by it at more than $7,000,000—most of which is in the City of New York. In addition, it appraises its "good-will" and other intangibles at $12,000,000.

Eighty-one per cent of the morning newspapers of the United States are members, and 59% of the evening newspapers; the aggregate of circulation of these newspapers is 96% of the total circulation of morning newspapers in the United States, and 77% of that of the evening newspapers. It has its own staff of 5,394, to whom should be added those engaged in gathering news in the employ of associate news services and of members. All in all, there are over 100,000 persons engaged in gathering news which is transmitted to it. It has 290,000 miles of leased news wires connecting 727 cities, and ninety-four news bureaus in the United States; and it has offices in more than 250 cities in this country and elsewhere. Its annual budget is approximately $12,000,000. There are sixty-four morning newspapers in the United States, having a circulation of over 50,000: all but one of these—the Chicago Sun—are members; and all but two of the morning newspapers having a circulation of between 25,000 and 50,000, are members. Aside from the news which it gathers from its members and through its staffs, it contracts with a number of individuals called "string men", who also gather news and send it on to the proper office, being paid only for what is accepted and printed.

There are a great many other news gathering associations of one sort or another in the United States; but of these, only two are comparable in size and efficiency with AP—United Press (which we shall call UP) and International News Service (which we shall call INS). UP is the larger: it is a corporation organized for profit, unlike AP. It makes contracts with its customers at stated rates, and without any exclusive provision except that out of 981 domestic subscribers, it has entered into "asset-value" contracts with 215—scattered among 144 cities. This means that, if another paper wishes to secure UP service but will compete with the holder of an "asset-value" contract, the newcomer must pay to the holder the amount stated as the "asset-value" of his contract. For

the year 1941 UP's expenses were nearly $7,000,000; it maintained sixty-one news bureaus, and thirty-three foreign offices; it had 2885 employees, and received news gathered by the staffs of 584 domestic newspapers and 454 domestic radio stations; it had 176,000 miles of leased wires. Many newspapers—apparently over 300—which are members of AP, also subscribe to UP; it served 40% in number, and 64% in circulation of the daily morning papers written in English, and 45% in number and 65% in circulation of the evening newspapers. Of the sixty-four newspapers with a circulation of over 50,000, it served thirty-nine, and of the forty-six with a circulation of between 25,000 and 50,000, it served twenty-three. Upon this motion we must take it as in dispute whether the general opinion in the calling is that the service of UP is better than that of AP, or vice versa; many prefer the foreign and financial services of UP; some, even its domestic service. There have been instances of members of AP surrendering their rights and taking on UP service, and vice versa.

INS is a department of a larger corporation, organized for profit like UP—the King Features Syndicate, Inc.—which combines a "straight" news service, a news photograph service, and a "feature syndicate": i.e. furnishing comment upon the news, comic strips, stories, etc. INS alone incurred expenses in 1941 of $2,600,000; it had 592 subscribers, of whom 338 were newspapers, and 182 radio stations; it maintained thirty-two domestic, and six foreign bureaus, and employed for news-gathering purposes over 2,100 persons, including its "string men." In addition, some seventy-five newspapers, and a number of radio stations furnished it with local news. It maintained a leased wire system connecting 186 cities. Like UP, it also makes "asset-value" contracts with its subscribers. Some newspapers are members of AP and also have "asset-value" contracts with both UP and INS. This is true in twenty-six cities, in which there is either only one daily paper or several owned in common; it is also true in eigh-

teen other cities where the only morning or evening paper is in the same position. In such cases no newspaper can obtain any of the three services without a substantial payment to the papers already in possession. We insert in the margin,[1] a table of the cost of admission to AP in accordance with its present rule, requiring the payment of ten percent of the aggregate past assessments paid in the assessing areas since 1900. The "asset-value" of six of the UP contracts was under $10,000; of twenty it was between $10,000 and $20,000; of fifteen, between $20,000 and $30,000; of six, between $30,000 and $40,000; of four, between $40,000 and $50,000; of one, between $50,000 and $60,000; and of one, between $60,000 and $70,000. There are no figures, so far as we can find, as to INS.

There are in this country, at least twenty to thirty other news agencies of various kinds; of these the most important are the Chicago Tribune-New York News Syndicate, the New York Herald Tribune Syndicate, and the New York Times News Syndicate. Each of these furnishes its service to any subscriber who meets its terms, but will ordinarily not furnish the service to two subscribers in the same city. It is not necessary to explain in detail the extent of these services; they are all substantial, but depend for the most part upon their own news gathering, as they are forbidden to distribute AP news by virtue of the AP by-laws. In competition with AP's picture service is Acme News Photos, Inc. There is so much dispute as to the relative efficiency of these two services that we must take it that Acme is at least the equal of AP. There have been a number of newspapers which have grown to very large size without AP service; the New York Daily News is an outstanding example, reaching a circulation of 1,200,000 before it became a member. The Chicago Sun,— which has never succeeded in becoming a member—in July, 1942, had attained a circulation of 327,000, and a Sunday circulation of over 400,000. Among others of very substantial circulation are the Cleveland Press, the Pittsburgh Press, the East St. Louis Journal, and the Harrisburg

| 1 | Morning and Sunday | Evening |
|---|---|---|
| New York | $824,333.82 | $575,003.49 |
| Chicago | 334,250.46 | 342,310.35 |
| Detroit | 152,789.68 | 154,606.86 |

| | | |
|---|---|---|
| Los Angeles | 228,126.82 | 134,709.80 |
| St. Louis | 182,323.42 | 186,882.23 |
| Baltimore | 169,163.78 | 148,658.13 |
| Boston | 253,680.16 | 218,917.92 |
| Cleveland | 144,865.63 | 131,474.13 |
| Philadelphia | 286,719.35 | 288,115.26 |
| Pittsburgh | 188,598.87 | 147,606.41 |
| Washington, D. C. | 118,930.08 | 88,293.20 |

Evening News. Until 1937 the New York Daily Mirror, and until 1936 the New York Journal, each achieved extremely large circulations indeed, without membership.

In 1941 AP bought all the shares of Wide World Photos, Inc. This company had been furnishing news pictures to newspapers—both members of AP and others; and it was in competition with AP, which paid $359,000 for its business in the western hemisphere and in all possessions of the United States. The seller—the New York Times—agreed not to sell news pictures in this territory for fifteen years; it had found the Wide World Photos, Inc., not a profitable undertaking, and that AP itself furnished adequate picture service. Six hundred and thirty-seven out of the 1,274 members of AP took the AP picture service, which it rendered to members alone. At the time of the transfer, the Wide World Photos, Inc., had 127 customers in all parts of the world—sixty of whom were English language newspapers in the United States. Forty-three of these were members of AP and eighty-four were not: of the forty-three AP members, all but seven also took pictures from AP. After buying the shares, AP changed the name of its picture service to "Wide World Features", and advertised it as the most complete coverage of news photographs and features. The old Wide World service has now been discontinued as to every subscriber in the United States who is not an AP member, except the newspaper, "P.M." One of the important assets purchased was the "morgue": i.e., a large collection of pictures suitable for publication.

The Canadian Press is the Canadian counterpart of AP; its by-laws provide: "No member shall furnish news * * * of the Canadian Press nor his own local news to which the Corporation has exclusive rights, to any person in Canada who is not a member of the Corporation, nor to any United States news agency or newspaper other than the Associated Press and its members." On November 1, 1935, AP and the Canadian Press agreed that the Canadian Press would furnish its news exclusively to AP outside of its own territory, and would prevent any of its members from furnishing its own news or local news to any newspapers or agencies other than AP and its members. The consideration for this promise was a similar promise by AP not to sell to anyone other than the Canadian Press in Canadian territory. On September 15, 1942, the Canadian Press had eighty-seven regular members and one associate member, and in February, 1943, there were at least seven daily newspapers in the Dominion of Canada which were not members of the Canadian Press. The aggregate circulation of members of that association was 2,305,203; and of those who were not its members, 116,583. UP has a wholly owned subsidiary, called the British United Press, which covers Canadian news. Its subscribers in Canada are fifty-three newspapers and thirty-nine radio stations; it exchanges news with UP. All Canadian radio stations which are subscribers to the British United Press must supply their local news to it. INS, The Chicago Tribune and the New York Times, also have newsgathering means in Canada.

■ The by-laws of AP are in effect agreements between the members: that one which restricts AP to the transmission of news to members, and that which restricts any member to transmitting "spontaneous" news to the association, are both contracts in restraint of commerce. They restrict commerce because they limit the members' freedom to relay any news to others, either the news they learn themselves, or that which they learn collectively through AP as their agent. The commerce which they restrict is interstate commerce. Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953. However, as everyone now agrees, since the decisions of the Supreme Court in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, and American Tobacco Co. v. United States, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, restriction alone is not enough to stamp a combination as illegal; it must be "unreasonable" in the sense that the common law understood that word; and that never has been, and indeed in the nature of things never can be, defined in general terms. Courts must proceed step by step, applying retroactively the standard proper for each situation as it comes up, just as they do in the case of negligence, reasonable notice, and the like. As good a statement as any of the common law upon the subject is that in the Restatement of Torts (§ 765, Vol. IV, Comment on Subsection 2): "Decision in each case depends upon a comparative appraisal of the values of the object sought to be accomplished by the actors' conduct, the effects of such conduct

and of the object on competition and on business enterprise, and the opposing interests of the actors in freedom of action and of the person harmed in freedom of opportunity to do business." Again, "self-interest particularly a purpose to advance the business interest of the actors, may be a justification even though the harm caused by the refusal" (to deal) "is intended to be the means of advancing that interest."

■ There are some situations in which the liabilities have now become settled. No combination fixing prices is valid; it is no excuse that some such arrangement may be necessary to prevent destructive price wars or the like. Whatever doubts were thrown upon United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, by Appalachian Coals, Inc., v. United States, 288 U.S. 344, 375, 53 S.Ct. 471, 77 L.Ed. 825, and Sugar Institute, Inc., v. United States, 297 U.S. 553, 599, 56 S.Ct. 629, 80 L.Ed. 859, have been finally laid in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210-228, 60 S.Ct. 811, 84 L.Ed. 1129. Again, if a combination effectively excludes, or tries to exclude, outsiders from the business altogether, it is a monopoly, or an incipient monopoly, and it is unconditionally unlawful. Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; American Medical Ass'n v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. ——. That is indeed the standard type of an illicit combination. A third instance is an attempt indirectly to extend the scope of a lawful monopoly: e. g., a patent or a copyright, beyond the terms of the grant, even though the sanction employed is no more than the monopoly itself. Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Interstate Circuit, Inc., v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. Finally, a combination may be illegal because of the means used to effect purposes lawful in themselves; and the means may be unlawful although it would not be, if used by a single person. It is arguable that a boycott, for instance, is always such a means: i.e., any use by a combination of its economic power to force a third person not to deal with another whom the combination wishes to coerce. At least, there is language in the books which lends itself to such a conclusion. Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Bedford Cut Stone Co. v. Journeymen Stone Cutters' Ass'n, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791; Fashion Originators' Guild v. Federal Trade Commission, supra, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. It is unnecessary to enumerate more of those means which have been condemned; and indeed, since they are generally part of an effort to monopolize, it is not always easy to be sure that that has not been the basis of their condemnation.

■ But these settled instances are not exhaustive; they are only illustrations of a general doctrine, whose scope they do not measure. When a situation does not fall within one of them, a court is forced to weigh the advantages gained by the combination against the injury done to the public, and apparently in this connection the public is the "purchasers or consumers" whom the combination will deprive "of the advantages which they derive from free competition." Apex Hosiery Co. v. Leader, 310 U.S. 469, 501, 60 S.Ct. 982, 996, 84 L.Ed. 1311, 128 A.L.R. 1044. It is not necessarily enough that a combined refusal to deal with others always has a weightier impact than that of an individual; as courts have frequently recognized that it must have. Grenada Lumber Co. v. State of Mississippi, 217 U.S. 433, 440, 30 S.Ct. 535, 54 L.Ed. 826; Binderup v. Pathé Exch., Inc., 263 U.S. 291, 312, 44 S.Ct. 96, 68 L.Ed. 308; Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 573, 574, 44 S.Ct. 162, 68 L.Ed. 448, 30 A.L.R. 1114. That is indeed a most important element, but alone it will not always serve; a combination may be within its rights, although it operates to the prejudice of outsiders whom it excludes. Anderson v. United States, 171 U.S. 604, 19 S.Ct. 50, 43 L.Ed. 300; Appalachian Coals, Inc., v. United States, supra, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825; Matthews v. Associated Press, 136 N.Y. 333, 32 N.E. 981, 32 Am.St.Rep. 741. This is illustrated in addition by those decisions in which, al-

though the court finally condemned a trade association, it went to great lengths to find its apparently innocent regulations a cover for price-fixing; the clear implication being that, without that element, the combination would have been lawful. Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A.1915A, 788; American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035; Sugar Institute, Inc., v. United States, supra, 297 U.S. 553, 597, 56 S.Ct. 629, at page 641, 80 L.Ed. 859. On the other hand, in cases like Anderson v. Shipowners' Ass'n, 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298; Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 51 S.Ct. 42, 75 L.Ed. 145; and United States v. First Nat. Pictures, Inc., 282 U.S. 44, 51 S.Ct. 45, 75 L. Ed. 151, although the combination did not try to fix prices, or altogether to exclude outsiders from the industry, but only to impose conditions upon their freedom of action, the injury imposed upon the public was found to outweigh the benefit to the combination, and the law forbade it. We can find no more definite guide than that.

Certainly such a function is ordinarily "legislative"; for in a legislature the conflicting interests find their respective representation, or in any event can make their political power felt, as they cannot upon a court. The resulting compromises so arrived at are likely to achieve stability, and to be acquiesced in: which is justice. But it is a mistake to suppose that courts are never called upon to make similar choices: i.e., to appraise and balance the value of opposed interests and to enforce their preference. The law of torts is for the most part the result of exactly that process, and the law of torts has been judge-made, especially in this very branch. Besides, even though we had more scruples than we do, we have here a legislative warrant, because Congress has incorporated into the Anti-Trust Acts the changing standards of the common law, and by so doing has delegated to the courts the duty of fixing the standard for each case. Congress might have proceeded otherwise; it might have turned the whole matter over to an administrative tribunal, as indeed to a limited extent it has done to the Federal Trade Commission. But, though it has act-ed, it has left, these particular controversies to the courts, where they have been from very ancient times.

As we have said, the crucial by-laws of AP are those which deal with the admission of members, for the fate of the others which the plaintiff challenges depends upon them. They give power to the directors to admit an applicant without condition of any sort and without the consent of any of the members, whenever he is publishing a paper in a "field" in a city in which there are no existing members: that is, in cases where the applicant is not competing with members directly, and does not propose to do so. So far the plaintiff does not object, for while it is true that such an applicant may still remotely compete, that competition may be disregarded, as the defendants themselves disregard it. When however the applicant is competing in the same "field" in a city with existing members, the directors have no power to admit him except upon the consent ("waiver") of his competitors; and while these have no longer their former absolute veto, they retain what we may fairly call a conditional veto. They may require the applicant to get the vote of a majority of all regular members and to fulfill the entrance conditions which we have described. To put the power into the hands of the majority, of whom only a very few can be competitors of the applicant, certainly gives the appearance of liberalizing admission; and unquestionably it has somewhat done so. Indeed, there have at times been sharp election contests, whose conduct was incidentally not always edifying. But, although the change was some abatement of the competitors' earlier control, it by no means opened membership to all those who would be entitled to it, if the public has an interest in its being free from exclusion for competitive reasons, and if that interest is paramount. Although, as we have said, only a few members will have any direct personal interest in keeping out an applicant, the rest will not feel free to judge him regardless of the effect of his admission on his competitors. Each will know that the time may come when he will himself be faced with the application of a competitor; and that will be true even as to those in whose "field" no applicant has as yet appeared. Unless he supports those who now object to the admission of their competitor, he will not in the future be likely to get their support against his own.

A by-law which leaves it open to members to vote solely as their self-interest may dictate, disregards whatever public interest may exist. It remains true that the situation may still be one of those in which, in the words of the Restatement, "self-interest * * * may be a justification even though the harm caused by the refusal is intended to be the means of advancing that interest"; but, the opposed interests must be assessed and balanced.

So much for the power of competing members to insist upon a vote of the majority. The conditions which they may exact when an applicant secures such a vote are plainly designed in the interest of preventing competition. The first is the payment of ten per cent of all the assessments paid by members in the same "field" for a period of over forty years: the payment to be distributed among those who have paid the assessments. This upon its face appears an exaction designed to compensate the applicant's competitors for the loss of their differential advantage, and incidentally to act as a deterrent. The defendants seek to justify it, however, upon the theory that it merely reimburses the competitors for that share in the capital assets which they must yield to him out of their collective interest. There are two answers to this. First, no such payment is required of an applicant who does not compete with any member, though he becomes equally a co-owner of the capital assets, and entitled to his share on any distribution. Second, the percentage was not in fact computed upon the value of the share in the capital assets to which an applicant becomes entitled on admission, even though we include in capital such questionable items as the employees' benefit fund (which, it would seem, could hardly be regarded as beneficial to members) or the value of the good-will (which, in part at any rate, must be dependent upon the power to exclude competitors). The evidence proves beyond doubt that, although the putative value of the assets, tangible and intangible, was a factor, the payments as a whole were also designed to compensate competitors for the loss in value of their membership, arising out of the applicant's improved position as a competitor. This was consistent enough with AP's position that membership ·is a purely personal privilege; but if that position be ill taken, the condition makes necessary the appraisal of the public interest. The other condition is that an applicant shall relinquish any exclusive right of his own to any news, and news picture, service; and shall "require" such service to be given on the same terms as he enjoys it, to any one of his competitors who demands it. To require him to relinquish his own exclusive rights may perhaps be "reasonable", but certainly it is not so to require him to secure similar rights to others. That may prove a complete bar to the admission of any applicant who is already a member of a news service not automatically open to all comers.

■ Is it permissible to treat membership in AP as a purely proprietary privilege? It is not a monopoly in the sense that membership is necessary to build up, or support, even a great newspaper. Such papers have been founded and have thriven without it; they have abandoned it, after they have used it. Indeed, there appear to be some who think that UP is a better service, at least in some departments, perhaps in all. But monopoly is a relative word. If one means by it the possession of something absolutely necessary to the conduct of.an activity, there are few except the exclusive possession of some natural resource without which the activity is impossible. Most monopolies, like most patents, give control over only some means of production for which there is a substitute; the possessor enjoys an advantage over his competitors, but he can seldom shut them out altogether; his monopoly is measured by the handicap he can impose. Fashion Originators' Guild v. Federal Trade Commission, 2 Cir., 114 F.2d 80, 85. And yet that advantage alone may make a monopoly unlawful. It would be possible, for instance, to conduct some kind of a newspaper without any news service whatever; but nobody will maintain that, if AP were the only news service in existence, the members could keep it wholly to themselves and reduce all other papers to such news as they could gather by their own efforts. The very virtues of the founders which had achieved their unique position, would force upon them hospitality to applicants. Nor need AP be even the best of all existing services; it might be enough that it was the largest and most popular, and that there was a substantial body of opinion in the calling which believed it to be the best. Its popularity is proved by the enormous preponderance of its members, both in number and in circulation; as well as by the fact that, out of nearly a thousand members of UP almost a third are also AP members. No decision

of ours as to the relative merits of the two would convince those who may chance to prefer it; the grievance of being unable to choose his own tools is not assuaged, when a court finds that the user does not understand his interest. And so, even if this were a case of the ordinary kind: the production of fungible goods, like steel, machinery, clothes or the like, it would be a nice question whether the handicap upon those excluded from the combination, should prevail over the claim of the members to enjoy the fruits of their foresight, industry and sagacity. But in that event the only interest we should have to weigh against that of the members would be the interest of the excluded newpapers. However, neither exclusively, nor even primarily, are the interests of the newspaper industry conclusive; for that industry serves one of the most vital of all general interests: the dissemination of news from as many different sources, and with as many different facets and colors as is possible. That interest is closely akin to, if indeed it is not the same as, the interest protected by the First Amendment; it presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.

News is history; recent history, it is true, but veritable history, nevertheless; and history is not total recall, but a deliberate pruning of, and calling from, the flux of events. Were it possible by some magic telepathy to reproduce an occasion in all its particularity, all reproductions would be interchangeable; the public could have no choice, provided that the process should be mechanically perfect. But there is no such magic; and if there were, its result would be immeasurably wearisome, and utterly fatuous. In the production of news every step involves the conscious intervention of some news gatherer, and two accounts of the same event will never be the same. Those who make up the first record—the reporters on the spot—are themselves seldom first hand witnesses; they must take the stories of others as their raw material, checking their veracity, eliminating their irrelevancies, finally producing an ordered version which will evoke and retain the reader's attention and convince him of its truth. And the report so prepared, when sent to his superiors, they in turn "edit", before they send it out to the members; a process similar to the first. A personal impress is inevitable at every stage; it gives its value to the dispatch, which without it would be unreadable. So much for those items which actually appear in all the larger news services, and which include all events of major interest. But these are not all: the same personal choice which must figure in preparing a dispatch, operates in deciding what events are important enough to appear at all; and about that men will differ widely; as we often find, when one service "carries" what others have thought too trivial; or may indeed have missed altogether.

For these reasons it is impossible to treat two news services as interchangeable, and to deprive a paper of the benefit of any service of the first rating is to deprive the reading public of means of information which it should have; it is only by crosslights from varying directions that full illumination can be secured. Nor is it an answer that the by-law challenged only applies to a "field", in which by hypothesis there is already an AP newspaper in which AP dispatches will appear. That is true, but the final product to the reader is not the AP dispatch simpliciter; but how and where it appears in the paper as it comes before him. That paper may print it verbatim, or a summary of it, or a part of it. The last two are certainly as authentically new and original as the dispatch itself; they bear somewhat the same relation to it that it does to the first report, or that the first report does to the event or occasion. And, even though the whole dispatch be printed verbatim, its effect is not the same in every paper; it may be on the front page, or it may be in an obscure corner; depending upon the importance attached to it. The headlines may plangently call it to readers' attention, or they may be formal and unarresting. There is no part of a newspaper which is not the handiwork of those who make it up; and their influence is often most effective when most concealed.

But what, it is asked, are the limits of such a doctrine? Does it apply to the engagement of a single reporter by a single editor? Suppose the only source of information about momentous events in some remote region is a single exceptionally gifted correspondent: must any paper which engages him agree to admit all others on equal terms? Consistently, must we not recognize the overriding public interest in

his reports, particularly since in such a case his employer will otherwise have a monopoly? The answer to such questions need not embarrass us: their pertinency presupposes that whatever is true in small matters, must be true in large; and the greater part of the law is founded upon a denial of exactly that; for in law differences in quantity again and again become decisive differences in quality. We need not therefore say how important the control of news in any supposititious case must be in order to demand relief; it is enough that in the case at bar AP is a vast, intricately reticulated, organization, the largest of its kind, gathering news from all over the world, the chief single source of news for the American press, universally agreed to be of prime consequence. Wherever may be the vanishing point of public concern with any particular source of information, that point is far beyond this service.

■ Finally, we are told that what we propose is equivalent to declaring that the business is "clothed with a public interest", and that that is beyond the powers of a court. There are decisions which so declare, although we do not consider as among them Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U.S. 667, 4 S.Ct. 185, 28 L.Ed. 291, or the Express Cases, 117 U.S. 1, 6 S.Ct. 542, 628, 29 L.Ed. 791. However, we could even assume arguendo that in the absence of any legislative action, courts will not undertake to say when any activity has enough public importance to demand their intervention. For, although any such conclusion is flatly contrary to the well-settled common law of contracts in restraint of trade, Congress, as we have said, has already acted, and it has acted by selecting the standard of the common law as the measure of its will. Historically that standard can only be applied by assessing the public importance of the activity which by hypothesis has been restricted; and practically no other conceivable standard is rationally available. So far therefore as the conclusion, when the public aspect of the activity prevails, involves a declaration that it is "clothed with a public interest," in administering the Anti-Trust Acts courts must so declare, as they have independently of those acts declared from time immemorial. The unhappy metaphor itself is ordinarily used in cases where a legislature sets up a developed system of positive regulation, with whose administration it charges some agency created for the

purpose. Obviously, that requires a legislative decision as preclude; and obviously, courts cannot discharge such duties. But there is no warrant for holding that the failure of Congress specifically to say that all activities are to be deemed so "clothed", whenever the courts find them to be, shall deny power to the courts to effect the legislative will. Indeed, the whole matter is a red herring which should no longer be allowed to break the scent. Since Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, there cannot be any excuse for misunderstanding the matter—there has really been none since Munn v. State of Illinois, 94 U.S. 113, 24 L.Ed. 77. "If one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue. * * * The phrase * * * can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good." Nebbia v. New York, supra, 291 U.S. 502, 534, 536, 54 S.Ct. 505, 514, 515, 78 L.Ed. 940, 89 A.L.R. 1469.

We conclude therefore that the present by-laws of AP unlawfully restrict the admission of members; and that further enforcement of them should be enjoined. We shall not attempt to say what conditions may be imposed; we hold no more than that members in the same "field" as the applicant shall not have power to impose, or dispense with, any conditions upon his admission, and that the by-laws shall affirmatively declare that the effect of admission upon the ability of an applicant to compete with members in the same "field" shall not be taken into consideration in passing upon his application. It is of course true that the members may disregard the last provision in practice; but that is not to be assumed. At any rate, we think that the plaintiff is entitled to that much positive assurance in the organic law; and it is as far as we can go.

■ The second charge is against the by-law which forbids the communication of news by AP to non-members, and of "spontaneous" news by members to non-members. The defendants answer as to the agreement not to disclose "spontaneous" news, that it is ancillary to the collection and transmission to AP of that news itself. News, they argue,—as its very name implies—has no value after it has once been published; if a member were free to impart "spontaneous" news to

374

others who could use it before AP, the whole value of the grant would be gone. Even if a member were allowed to impart it to others who could use it simultaneously, its chief value would be gone, for that rests upon priority. As to the agreement that AP shall not impart news collected by it to non-members, similar considerations apply; they would lose all benefit of the expenses incurred in its collection unless they had priority. It is well settled, they continue, that a restrictive covenant necessary to the protection of property transferred is "reasonable." The most common one is an agreement not to compete with the buyer of a business, or of a professional practice, for a limited time and in a limited territory; but that, they insist, is only one example of the general doctrine, which many and various decisions support. We quite agree with all this: taken by themselves, and apart from the restrictions upon membership, both agreements would be valid; it is essential to the protection of the main purpose that the member who furnishes "spontaneous" news, or AP itself, shall not destroy the value of what is transferred by making it available to others, before it can be published. Nevertheless, in all such cases the power must not be incident to a combination which, though bound to admit all on equal terms, does not do so. United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810; United States v. Great Lakes Towing Co., D.C., 208 F. 733, affirmed D.C., 217 F. 656. While the present by-laws as to admission are in force, these agreements are parts of an unlawful combination, and they must be enjoined until the primary wrong is remedied.

 The third charge is the purchase of all the shares of Wide World Photos, Inc.; and—no intent to monopolize being shown—that charge necessarily rests upon section seven of the Clayton Act, and, so in turn, upon whether the existing competition between AP and Wide World Photos, Inc., was "substantial." Plainly, it was not; AP did not sell its picture service to outsiders, so that the only possible competition of Wide World Photos, Inc., was in diverting from AP its members who might otherwise have taken AP's picture service. There were however only seven AP members, who subscribed to Wide World Photos, Inc., and did not subscribe to AP service. In these circumstances we cannot see how the pur-

chase could have suppressed any but the most trivial competition. This part of the complaint must be dismissed.

 The fourth and last charge is the "cartel", or agreement, between AP and the Canadian Press that Canadian Press dispatches shall go only to AP members, and that AP dispatches shall go only to Canadian Press members. So far as by this means AP secures to its own members exclusively all Canadian Press dispatches, the contract falls within the ban of the restrictive covenants challenged in the second charge. It is true that AP's only covenant is not to give its dispatches to newspapers in Canada which are not members of the Canadian Press, and that the Anti-Trust Acts are directed only to the protection of American interests; nevertheless, that covenant is the consideration for securing to AP members a monopoly of the Canadian Press dispatches, and condemns the contract as a whole. We can see no reason, however, why, if admission to AP were properly liberalized, it should not make such an agreement, whatever effect it may have in Canada. How far the Canadian law might forbid its execution there, is obviously not for us to decide.

 In conclusion it is perhaps proper that we should say a word about the freedom of the press, since that question has been mentioned in the briefs. The effect of our judgment will be, not to restrict AP members as to what they shall print, but only to compel them to make their dispatches accessible to others. We do not understand on what theory that compulsion can be thought relevant to this issue; the mere fact that a person is engaged in publishing, does not exempt him from ordinary municipal law, so long as he remains unfettered in his own selection of what to publish. All that we do is to prevent him from keeping that advantage for himself. The argument appears to be that if all be allowed to join AP, it may become the only news service, and get a monopoly by driving out all others. That is perhaps a possibility, though it seems to us an exceedingly remote one; but even if it became an actuality, no public injury could result. For, if AP were open to all who wished the service, could pay for it, and were fit to use it, it would be no longer a monopoly: a monopoly of all those interested in an activity is no monopoly at all, for no one is excluded and the es-

sence of monopoly is exclusion. AP would then be only a collective effort of the calling as a whole. If other services were incidentally driven out, that would not be an actionable wrong.

A judgment may therefore be entered enjoining the defendants from continuing to enforce the by-laws regulating the admission of members in their present form, but leaving it open to them to adopt substitutes which will restrict admission, provided that members in the same "field" as the applicant shall not have power to impose, or dispense with, any conditions upon his admission, and that the by-laws shall affirmatively declare that the effect of admission upon the ability of an applicant to compete with members in the same "field" shall not be taken into consideration in passing upon his application. The judgment will also enjoin the enforcement of the restrictive by-laws forbidding members to communicate "spontaneous" news to non-members. (On the argument, the plaintiff declared that it did not object to the by-law which confines AP dispatches to its own members. We do not know whether it still would not object, if the admission provisions remained as they are. An injunction against the enforcement of that by-law will depend upon its choice.) The judgment will further enjoin performance of the contract, or "cartel", with the Canadian Press. In all other respects the complaint will be dismissed. Such a judgment will finally dispose of all the issues raised in the action upon the facts as they now are. However, it is appropriate and fair to provide that, if AP sees fit to amend its by-laws, governing the admission of members, it may have leave to apply in this action for supplemental relief upon the new state of facts. Moreover, in view of the disorganization which meanwhile might take place, if the injunction were enforced against the restrictive covenants as to the communication of news and against the Canadian Press contract, we will stay those injunctions for a period of 120 days after the judgment has been entered. That should be time enough for the defendants to decide what changes, if any, they care to make as to admission. Finally, because the interests involved are so important and so large; because the injury done may be so great, if we turn out to be wrong; and because we are not agreed, the whole judgment will be stayed for a period of sixty days after it is entered, and subsequently for the pendency of any appeal to the Supreme Court, if one is taken within that period.

The plaintiff will submit proposed findings and a proposed judgment; and will serve the same upon the defendants, who will submit any substitutes they may wish within thirty days thereafter.

SWAN, Circuit Judge (dissenting).

I regret that I am unable to concur in the decision of the court. Since my argument has not convinced my brothers, its validity is subject to grave doubt; nevertheless, I feel constrained to state briefly my reasons for differing with them.

This suit is founded upon alleged violations of the Anti-Trust Acts. The defendants are charged with having agreed to monopolize or unreasonably to restrain interstate commerce. It seems self-evident, and is not, I think, doubted by the majority opinion, that two newspapers might appoint a common agent to gather news and edit news reports for their common and exclusive use without running foul of the statutes. Such a case is thought to be differentiated from the present by the size and efficiency of the AP organization. I agree that what is true in small matters is not necessarily so in large matters; that difference in degree may produce difference in legal result. But to violate the anti-trust law the combination, whatever its size, must tend to monopolize or to restrain unreasonably interstate trade. Clearly the provisions of AP's by-laws as to admission of members have had no tendency to create a monopoly in news gathering—witness the growth of UP, INS, and other news gathering agencies. Nor is there proof that they have stifled competition between member newspapers and other newspaper owners or prospective publishers. Not a single instance has been adduced where a newspaper failed because it lacked an AP membership or was not started because the intending publisher could not obtain one. On the contrary, numerous papers have attained great success without such membership. What, then, is the ground for holding that the by-law provisions have resulted in an unreasonable restraint of trade either in news gathering or in newspaper publishing? Solely the court's view that a news gathering organization as large and efficient as AP is engaged in a public calling, and so under a duty to admit "all 'qualified' applicants on equal terms."

The only authority advanced by the plaintiff in support of the proposition that news gathering is a public calling is a discredited decision in Inter-Ocean Pub. Co. v. Associated Press, 184 Ill. 438, 56 N.E. 822, 48 L.R.A. 568, 75 Am.St.Rep. 184. This litigation involved not the present AP, but an earlier Illinois corporation whose charter granted it a power of eminent domain. The decision is contrary to Matthews v. Associated Press of State of New York, 136 N.Y. 333, 32 N.E. 981, 32 Am.St.Rep. 741, as was recognized in News Pub. Co. v. Associated Press, 190 Ill.App. 77. It was explained in a later opinion by the Supreme Court of Illinois, People v. Forest Home Cemetery Co., 258 Ill. 36, 41, 101 N.E. 219, L.R.A. 1917B, 946, Ann.Cas.1914B, 277, as resting upon the existence of the power of eminent domain. The Supreme Court of Missouri repudiated the doctrine of the Inter-Ocean case in State ex rel. Star Pub. Co. v. Associated Press, 159 Mo. 410, 60 S.W. 91, 51 L.R.A. 151, 81 Am.St.Rep. 368.

The business of gathering news is not one of those occupations which were recognized at common law as affected with a public interest AP has never held itself out as ready to serve all newspapers. Nor has it been granted the power of eminent domain or any other public franchise which might justify imposing the duty to serve all applicants without discrimination. If such a duty is to be imposed on news gathering agencies, I think it should be by legislative, rather than judicial, fiat. In Atchison, T. & S. F. R. Co. v. Denver & N. O. R. Co., 110 U.S. 667, 4 S.Ct. 185, 28 L.Ed. 291, the question arose whether the Atchison was obliged to make joint traffic arrangements with the Denver & New Orleans on the same terms as it had granted to another connecting railroad. The court held that in the absence of appropriate legislation there was no such duty, saying at page 685 of 110 U.S., 4 S.Ct. at page 194, 28 L.Ed. 291:

"Were there such a statute in Colorado, this case would come before us in a different aspect. As it is, we know of no power in the judiciary to do what the Parliament of Great Britian has done, and what the proper legislative authority ought perhaps to do, for the relief of the parties to this controversy."

Again, in Express Cases, 117 U.S. 1, 6 S. Ct. 542, 628, 29 L.Ed. 791, which held that the railroads need not in the absence of a statute furnish to all independent express companies equal facilities for doing an express business upon passenger trains, it was said (117 U.S. at page 29, 6 S.Ct. at page 556, 29 L.Ed. 791): "The regulation of matters of this kind is legislative in its character, not judicial." The same thought was expressed by Mr. Justice Brandeis with respect to the very subject of news gathering in his dissenting opinion in International News Service v. Associated Press, 248 U.S. 215, at page 267, 39 S.Ct. 68, at page 82, 63 L.Ed. 211, 2 A.L.R. 293:

"Courts are ill-equipped to make the investigations which should precede a determination of the limitations which should be set upon any property right in news or of the circumstances under which news gathered by a private agency should be deemed affected with a public interest. Courts would be powerless to prescribe the detailed regulations essential to full enjoyment of the rights conferred or to introduce the machinery required for enforcement of such regulations."

Similar views have been announced in cases involving stock exchanges, cotton warehouses, and stockyards. American Livestock Commission Co. v. Chicago Livestock Exch., 143 Ill. 210, 32 N.E. 274, 18 L.R.A. 190, 36 Am.St.Rep. 385; Heim v. New York Stock Exch., 64 Misc. 529, 118 N.Y.S. 591; Ladd v. Southern Cotton Press & Mfg. Co., 53 Tex. 172; Delaware, L. & W. R. Co. v. Central S. Y. & Transit Co., 45 N.J.Eq. 50, 17 A. 146, 6 L.R.A. 855, affirmed 46 N.J.Eq. 280, 19 A. 185. And I find nothing in Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, to contradict this view. There the New York legislature had acted; it had set up elaborate administrative machinery to regulate the milk industry. The chief question for decision was whether enforcement of Section 312(e) of the statute, Agriculture and Markets Law, Consol. Laws N.Y. c. 69, denied the appellant the due process secured to him by the Fourteenth Amendment. In sustaining the legislation, Mr. Justice Roberts remarked that so far as due process is concerned a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose; and he added (291 U.S. at page 537, 54 S.Ct. at page 516, 78 L.Ed. 940, 89 A.L.R. 1469) that "The courts are

without authority either to declare such policy, or, when it is declared by the legislature, to override it."

In the case of a business which was not recognized as a public calling at common law, I believe it is sound policy to leave to the legislature to determine whether the public welfare requires that all applicants be served without discrimination. This is particularly true where the duty to serve all comers does not depend upon the mere nature of the occupation, but upon the fact that the particular business has reached such a state of size and efficiency as to give the persons whom it serves some competitive advantage over applicants whom it declines to serve. At once the question occurs to the mind whether UP, INS, the New York Times News Syndicate, or any of the other news gathering agencies must also serve all comers. The problem of when such a stage is reached is one of economic policy which should be settled by legislation, rather than having the answer plotted gradually by successive judicial decisions. Furthermore, although the decree we are to enter takes the form of an injunction, in substance we are assuming the legislative function of prescribing the terms and conditions upon which newspapers shall be admitted to membership. We do not, it is true, affirmatively order an amendment of the by-laws, but we give leave to apply for a lifting of the injunction after they have been amended. How the directors or members of AP are to determine in advance of adoption whether a proposed amendment will be satisfactory to the court I cannot see, unless we are in effect to supervise a revamping of the by-laws. Such revamping will require many changes in the present setup and will present many problems which I fear the court may be ill-equipped to decide.

Finally, the Anti-Trust Acts are not, in my opinion, a justification for imposing on AP the duty to serve without discrimination all newspaper applicants. The case principally relied upon by the plaintiff to show that the Sherman Act, 15 U.S.C.A. § 1 et seq., may be used to secure indiscriminate service to all comers is United States v. Terminal Railroad Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810. In that opinion Mr. Justice Lurton pointed out that in ordinary circumstances a number of independent companies might lawfully combine for the purpose of acquiring terminals for their common, but exclusive, use, but by reason of the peculiar topographical situation the terminals acquired by the Association gave it control of every feasible means of railroad access to St. Louis; and the decision was based in large measure upon that fact (224 U.S. at page 405, 32 S.Ct. at page 513, 56 L.Ed. 810). Although the Government urged that the Association be dissolved, the court directed, on account of the obvious advantages of a unification of terminal facilities, that the defendants submit a plan of reorganization which should make the Association the bona fide agent and servant of every railroad line desiring to use its facilities. I do not regard the case as apposite to the situation at bar. As already pointed out, the Terminal Association had obtained a complete monopoly. But AP has no monopoly in news gathering. The most that the plaintiff can urge is that a newspaper which is excluded from AP membership "operates under a competitive disadvantage with AP members." Even if this allegation of the complaint, which the answer denies, be accepted as proved despite the evidence that UP claims its service to be superior and many newspapers have preferred it, I think such handicap of competitors insufficient to establish a violation of the Anti-Trust Acts. The majority opinion intimates that in the case of ordinary goods it might not suffice, but holds that it does in the case of news reports. To my mind the nature of a news report, which is the intellectual product of him who makes it, points to the conclusion that he may choose to whom he will disclose it, rather than to the conclusion that he is under a duty to disclose it to all applicants.

For the foregoing reasons I am of opinion that the motion for summary judgment should be denied.