CITY OF CLEVELAND, APPELLEE, *v.* MECHANIC, APPELLANT.

(No. 29778—Decided May 20, 1971.)

Mr. *Clarence D. Rogers, Jr.,* city prosecutor, and Mr. *Fred Jurek,* for appellee.

Messrs. *Rudd, Miller, Sheerer & Lybarger,* for appellant.

## I.

DAY, C. J. In this opinion Harvey L. Mechanic will be referred to as "defendant" or "defendant Mechanic" and the city of Cleveland as the "city," the "state" or "Cleveland."

## II.

On August 16, 1968, the defendant was participating in a demonstration in front of the Terminal Tower on the Public Square in Cleveland, Ohio. The physical area in which the demonstration took place extended across three double doorways to and from the Terminal Tower, ranging over the surface of the sidewalk for 65-70 feet (in a roughly east-west direction) by 60 feet north and south from the doorways to the curb. (R 18-19) Police officer witnesses differed widely in their estimates of the number of "demonstrators" involved ("15-20", R 18) ("50-100", R 25). A defense witness, the only civilian except the defendant to testify to specific numbers, estimated "50 to 40 [*sic*] people * * * on the sidewalk"[1] (R 36). However, another civilian witness for the state testified that he saw "a large group of students in front of the Terminal Tower. They had taken up the complete sidewalk. They were all grouped together." (R. 6) The defendant in answer to the question "How many were in your group * * *" answered "Between 10 or 15." (R 44)

The defendant was dressed in a way to attract attention (R 46) and was attempting to hand out leaflets on the Vietnam War "to talk to pedestrians about the war" following a "guerilla theater" performance in front of the Terminal Tower. (R 38-39)

There was conflict in the testimony about (1) the tone and manner of the defendant's conversations with passers-

---

[1] It is not clea٠ that the word "people" in the testimony excludes all but demonstrators.

by (R 21, 35, 43, 45-46), (2) the question whether he physically placed or attempted to place leaflets in the pockets of persons who would not take them (R 7, 21, 35, 39), (3) whether he literally pushed persons off the sidewalk (R 10-11, 13, 16, 22, cf. 43, 47), (4) whether he attempted to place the literature "on" a pedestrian forcing him into the street (R 10-11, 44-45), and (5) if he blocked passage so that it was necessary to get into the street to get around him (R 22, 39, 44) or whether the crowd, including spectators and demonstrators was so large that it was necessary for pedestrians to go into the street (R 17, 10-11). A complaining pedestrian said defendant desisted from any effort to place literature in his pockets when the pedestrian "* * * told him to keep his hands off me." (R 10-11, 16)[2]

After watching the defendant's conduct for about 20 minutes (R 21, 23-24), the arresting officer was still uncertain whether the defendant's conduct justified his arrest[3]

---

[2] The testimony on cross-examination was as follows:

"Q It wasn't the defendant who forced you into the street, was it?

"A He was part of the group that was in my way.

"Q He was just part of a group, isn't that so?

"A Yes. He was part of the group.

"Q And it is a fact that there was congestion on the sidewalk that forced you to walk into the street?

"A It was also Mr. Mechanic that forced me off into the street, with the literature that he was trying to put on me. I told him to keep his hands off me.

"Q He did, didn't he?

"A After I told him, yes, sir. (R 10-11)

"* * *

"Q How full was the sidewalk, if you remember?

"A It was jammed.

"Q It was jammed from the doors to the street?

"A Yes, sir." (R-16)

[3] The arresting officer testified as follows:

"Q What, if anything, did you observe Harvey Lee Mechanic do that day?

"A He was quite outstanding because he was dressed in a mock World War I uniform, and carrying a realistic toy machine gun.

"Q What was he doing?

"A He was acting kind of wild.

"Q What do you mean?

"A He was moving his arms around, and saying, 'Get out of Viet Nam.'

until after defendant jerked his draft card out of the officer's hands several times during an identification procedure at the scene (R 9, 23). The officer was uncertain also whether the charge should be "interfering with a

"Q What was the tone of his voice?

"A Very harsh, and I'd say loud.

"Q What else did he do, if anything?

"A I spotted a couple of old ladies. I think that he scared them a little bit with that gun. I observed him, as the people were going by, he would be trying to force literature on them, and they won't want it. He tried to practically stick it in their coat.

"Q How long did you observe him to do this?

"A We were watching him for about, I'd say, 20 minutes, anyhow.

"Q While you were observing him, what else happened, if anything?

"A Well, on this particular occasion I spotted him forcing Mr. Sawchik off the sidewalk and into the street.

"Q How did the Defendant do this?

"A I wouldn't say that he used his hands. He more or less used body force, just blocking the sidewalk in general instead of moving over and letting the man through.

"Q What did you do at that juncture?

"A Well, shortly after that, I was approached by this man—I learned to be Mr. Saw hik—and he approached me and told me about this. Well, of course, I observed it. I don't know who he was at the time.

"I went over to Mr. Mechanic with my partner after one of the captains said, 'Well, why don't you check these men out?'

"And so we went over to check Mr. Mechanic out and asked him for his draft card.

"At that point I wasn't quite sure whether I was going to make an arrest or not. I asked him for his draft card. I have asked thousands of young men for their draft cards. He handed it to me, but as soon as I got it in my hand and trying to write down the information, he snatched it out of my hand. It was obvious to me, in my opinion, if I can express it, he seemed to me that he wanted to be arrested.

"Q So what did you do?

"A He did this three or four times, snatching it out of my hands. I placed him under arrest.

"Q What happened after that?

"A I consulted with the prosecutor. At the time I wasn't sure whether I was going to arrest him for disorderly conduct or not, because I am not too familiar with the laws as the prosecutor was. I was thinking in terms of 'Interfering with the police officer.' I felt that when he was pulling the draft card out of my hands, I thought that he was interfering with my duties. The prosecutor felt that the affidavit issued for disorderly conduct would be best." (R 21-23)

police officer" or "disorderly conduct" until he had checked with the prosecutor. (R 23)

### III.

Defendant Mechanic was charged under Cleveland Ordinance Section 13.1126 regulating disorderly conduct.[4] The charging affidavit alleged: "* * * [that defendant] unlawfully and wilfully conduct[ed] himself in a noisy, rude, insulting and disorderly manner by then and there blocking pedestrians on the sidewalk in front of the Terminal Tower and attempting to engage them in emotional argumentation concerning his draft law views and the war in Vietnam and so as to disturb the quiet and good order of said city * * *." (See affidavit in original papers.)

Defendant was convicted in a bench trial[5] and brings this appeal assigning five errors. The bases for these assignments as claimed are:

1. The ordinance is an overbroad regulation in the First Amendment area and is, therefore, void.

2. The ordinance is void for vagueness.

3. The conviction, for all that appears, may rest on either a constitutional or an unconstitutional basis and cannot survive that condition.

4. The record raised the suspicion that the defendant was convicted not for what his actions or words may have been before his arrest but for what he is alleged to have

---

[4]"Section 13.1126 [2971-3] Rude, Abusive Disturbance, Etc.; "Penalty.

"If any person shall wilfully conduct himself in a noisy, boisterous, rude, insulting, or other disorderly manner, by either words or acts, toward any other person, with intent to abuse or annoy such person, or disturb the good order and quiet of the same, the person so offending shall, on conviction thereof, be fined in any sum not exceeding fifty dollars, or imprisoned at hard labor in the House of Correction, or both, at the discretion of the court; such imprisonment for the first offense not to exceed thirty days; for the second offense, ninety-day [sic]; for third and each subsequent offense, six months."

[5]The crucial entry in pertinent part reads: "Jury waived. Trial had, plead not guilty, found guilty and he is sentenced * * *." Tr. 1. The bill of exceptions as settled by the court recites only that "after due deliberation and consideration," the court "found the Defendant guilty as charged in the affidavit." (R 49)

done afterwards. This amounts to a conviction on an uncharged crime in violation of Due Process of Law.

5. The evidence of the government alone and in conjunction with the defendant's evidence, both taken at their strongest, fails to show wilful misconduct—an essential element of the crime charged. Conviction in the face of such failure violated due process.

*IV.*

Such claimed errors involve propositions which sensitize the First Amendment[6] to the United States Constitution. When this occurs it is our duty to proceed under the aegis of those cases in the Supreme Court of the United States which have incorporated or, at any rate, applied the prohibitions of the First Amendment to the States through the Due Process clause of the Fourteenth Amendment. *Stromberg* v. *California* (1931), 283 U. S. 359, 368, 75 L. Ed. 1117, 1122-1123; *Near* v. *Minnesota* (1931), 283 U. S. 697, 707, 75 L. Ed. 1357, 1363; *Grosjean* v. *American Press Co.* (1936), 297 U. S. 233, 244, 80 L. Ed. 660, 665; *DeJonge* v. *Oregon* (1937), 299 U. S. 353, 364, 81 L. Ed. 278, 283-284; *Lovell* v. *Griffin* (1938), 303 U. S. 444, 450, 82 L. Ed. 949, 953; *Schneider* v. *State* (1939), 308 U. S. 147, 160, 84 L. Ed. 155, 164; *Cantwell* v. *Connecticut* (1940), 310 U. S. 296, 303, 84 L. Ed. 1213, 1218; *A. F. L.* v. *Swing* (1941), 312 U. S. 321, 325-326, 85 L. Ed. 855, 857; *Taylor* v. *Mississippi* (1943), 319 U. S. 583, 588-589, 87 L. Ed. 1600, 1606; *Saia* v. *New York* (1948), 334 U. S. 558, 559-560, 92 L. Ed. 1574, 1577; *Edwards* v. *South Carolina* (1963), 372 U. S. 229, 235, 9 L. Ed. 2d 697, 702. *Cf. Gitlow* v. *New York* (1925), 268 U. S. 652, 69 L. Ed. 1138, 1145, and those cases which have held that there is a fundamental quality, a primacy, to First Amendment rights which makes them a special concern of the law. *Schneider* v. *State, supra,* at 161, 84 L. Ed. at 164; *Saia* v.

---

[6]"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Amendment I, U. S. Constitution.

*New York, supra,* at 562, 92 L. Ed. at 1578; *Thomas* v. *Collins* (1945), 323 U. S. 516, 530, 89 L. Ed. 430, 440; and *Marsh* v. *Alabama* (1946), 326 U. S. 501, 509, 90 L. Ed. 265, 270.

"If \* \* \* appellant seeks for freedom of conscience a broader protection than for freedom of the mind, it may be doubted that any of the great liberties insured by the First Article can be given higher place than the others. *All have preferred position in our basic scheme.* [Citing cases.] All are interwoven there together. Differences there are, in them and in the modes appropriate for their exercise. But they have *unity in the charter's prime place* because they have unity in their human sources and functionings \* \* \*." *Prince* v. *Commonwealth of Massachusetts* (1944), 321 U. S. 158, 164-165, 88 L. Ed. 645, 651. (Emphasis supplied.)

"These freedoms are delicate and vulnerable, as well as *supremely precious* in our society. \* \* \* Because First Amendment freedoms need breathing space to survive, government may regulate in the area *only with narrow specificity* \* \* \*." *NAACP* v. *Button* (1963), 371 U. S. 415, 433, 9 L. Ed. 2d 405, 418.[7] (Emphasis supplied.)

The reasons for broadening and especially safeguarding these rights are clear. Apart from a concern for individual dignity basic to the First Amendment, the essence of a democratic society lies in preservation of the right of discussion and dissent untrammelled by state interference. This is so because the theory of government to which we adhere presupposes that the aggregate good sense of common men will result in adequate political judgments.[8]

---

[7] There may have been slight jogs in the line of authority in support of the primary proposition, but in the main the line has been straight and true. The cases cited in the text amply demonstrate the current vitality of the principle.

[8] The First Amendment "\* \* \* presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than throug . an kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." Judge Learned Hand in *United States* v. *Associated Press* (S. D. N. Y. 1943), 52 F. Supp. 362, 372.

The effective participation of the self-governing citizen in turn requires full access to the information necessary to judgment. Such assumptions make expression and dissent indispensible.

"* * * Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama* (1940), 310 U. S. 88, 102, 84 L. Ed. 1093, 1102; *cf. Terminiello* v. *Chicago* (1949), 337 U. S. 1, 4-5, 93 L. Ed. 1131, 1134, 1135 (Rehearing denied 1949); *Edwards* v. *South Carolina* (1963), 372 U. S. 229, 237-238, 9 L. Ed. 2d 697, 703.

It follows that society has an interest in the extension to the states of protection for First Amendment rights and that a societal concern is expressed in a special sensitivity for their protection.

Implicit, but not often expressed, are *cognate* rights essential to the right of expression:

"It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate[9] rights, * * * and therefore are united in the First Article's assurance." *Thomas* v. *Collins, supra*, at 530, 89 L. Ed. at 440.

The right to assemble implies right to speak, *De Jonge* v. *Oregon, supra*, at 364, 81 L. Ed. at 284; the right to read implies the right to publish just as the right to publish implies the right to circulate, *Grosjean* v. *American Press Co., supra*, at 250-251, 80 L. Ed. 668-669; *Lovell* v. *Griffin*, 303 U. S. 444, 452, 82 L. Ed. 949, 954, *cf. Ex Parte Jackson* (1878), 96 U. S. 727, 733, 24 L. Ed. 877, 879; see also *Brotherhood of Railway Trainmen* v. *Virginia* (1964), 377

---

[9]On fundamental liberties and cognate rights, cf. *Aptheker* v. *The Secretary of State* (1964), 378 U. S. 500, 517, 12 L. Ed. 2d 992, 1004, especially Black, J., at 517, 12 L. Ed. 2d at 1004, and Douglas, J., at 519, 12 L. Ed. 2d at 1005, both concurring.

U. S. 1, 5-6, 12 L. Ed. 2d 89, 92-93; *cf. Griswold* v. *Connecticut* (1965), 381 U. S. 479, 482-484, 14 L. Ed. 2d 510, 513-515. The *Griswold* case speaks of a "penumbra" of rights which in our view includes the cognate rights vouchsafed by the foregoing cases but, in addition, encompasses the right *not* to listen, *not* to read or assemble and to *refrain* from petitioning the government. *Cf.* p. e. *Martin* v. *Struthers* (1943), 319 U. S. 141, 146-147, 87 L. Ed. 1313, 1319:

"Freedom to distribute information to every citizen *wherever he desires to receive it* is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. The dangers of distribution can so easily be controlled by traditional legal methods, *leaving to each householder the full right to decide whether he will receive strangers as visitors * * *.*" (Emphasis added.)

In consequence, the role of the state in matters of expression is not to compel either dissemination or acceptation of viewpoints. Neither participation in a particular expression nor abstinence is its concern. Its role is complete when it induces and protects a political climate[10] in which a reasonably courageous person feels no chill either in participating or abjuring expression or in exercising such concomitant rights as listening or not. The limitations on the state have never been better stated than in *West Virginia State Bd. of Education* v. *Barnette* (1943), 319 U. S. 624, 87 L. Ed. 1628, 1639. The court said, at page 642:

"If there is any fixed star in our constitutional constellation, it is that no official high or petty, can prescribe what shall be orthodox in politics, nationalism, religion,

---

[10]"* * * Reliance for the most precious interests of civilization, therefore, must be found outside of their vindication in courts of law. Only a persistent positive translation of the faith of a free society into the convictions and habits and *actions of a community* is the ultimate reliance against unabated tempuat ns to fetter the human spirit." *Cf.* Frankfurter, J., dissenting in *West Virginia State Board of Education* v. *Barnette, supra,* 671, 87 L. Ed. 1654, 1655. (Emphasis supplied.)

or other matters of opinion or *force* citizens to confess by word or act their faith therein." (Emphasis supplied.)

Inroads may be made on these concepts only in the presence of a "clear and present danger"[11] (*Schenck* v. *United States* (1919), 249 U. S. 47, 52, 63 L. Ed. 470, 473; *Cantwell* v. *Connecticut* (1940), 310 U. S. 296, 311, 84 L. Ed. 1213, 1221; *Edwards* v. *South Carolina* (1963), 372 U. S. 229, 237-238, 9 L. Ed. 2d 697, 703), to organized government and the "apprehension of danger" must be "reasonable" cf. *Herndon* v. *Lowry* (1937), 301 U. S. 242, 258, 81 L. Ed. 1066, 1075. A clear and present danger has been judicially defined:

"The vehemence of the language used is not alone the measure of the power to punish * * *. The fires which it kindles must constitute an imminent, not merely a likely threat * * *. 'The danger must not be remote or even probable; it must immediately imperil.' " *Craig* v. *Harney*, 331 U. S. 367, 376, 91 L. Ed. 1546, 1552 (1947). *Cf. Wood* v. *Georgia*, 370 U. S. 375, 384, 8 L. Ed. 2d 569, 576 (1962) : "* * * the substantive evil must be extremely serious and the degree of imminence extremely high before uttrances can be punished * * *."

In addition to these principles we are constrained by others activated by the constitutional claims in this case.

---

[11]Perhaps the clear and present danger test is the formulation having the greatest prevalence in the rhetoric of the Supreme Court of the United States. In at least one case the concept was modified to "gravity of the 'evil' discounted by its improbability." See *Dennis* v. *United States* (1951) 341 U. S. 494, 510, 95 L. Ed. 1137, 1153. *Cf. American Comm. Assn.* v. *Douds* (1950), 339 U. S. 382, 409-412, 94 L. Ed. 925, 949-951. *Rehearing denied* (1950), 339 U. S. 990, 94 L. Ed. 1391. The clear and present danger test has been criticized for limiting expression to ineffectiveness, for vagueness, for requiring impossible factual judgments by the courts, for providing insufficient protection f or overreaching legislative investigations, and, when expanded to include such considerations as the nature and gravity of the evil to be prevented, for being indistinguishable from the *ad hoc* balancing t  See Emerson, Toward a General Theory of the First Amendment, 51-53 (Random House 1966). *Cf.* Black and Douglas, J. J., concurring in *Brandenburg* v. *Ohio* (1969), 395 U. S. 444, 449, et seq., 23 L. Ed. 2d 430, 435 et seq.

We must, if we can, avoid the constitutional issues and especially a constitutional decision overriding a legislative act. These latter considerations require that we "* * * resist the pulls to decide the constitutional issues involved * * * on a broader basis than the record before us imperatively requires." *Street* v. *New York* (1969), 394 U. S. 576, 581, 22 L. Ed. 2d 572, 578. Nevertheless, this relatively small case is parent to large issues and requires sensitive determinations.

## V.

The announced restraints (see IV above) on our decisional choices and the view we take of the evidence require us to reverse the conviction and enter final judgment for the defendant and discharge him on the basis of assignment of error number three only, without passing on the constitutional propriety of the ordinance involved. That conclusion renders consideration of assignments one and two inappropriate and four and five unnecessary.

It is evident that grave issues were under discussion by the defendant in this case. Equally evident is the proposition that there is no doubt that all or part of his auditors did not want to listen to him or to read the literature proffered them. There is also credible evidence upon which the trial court could support a finding that defendant was guilty of forcing persons off the sidewalk. We turn aside briefly only to say that were the single issue the defendant's right to press his views on members of the public by stuffing the pockets of unwilling recipients with literature he could not prevail. Nor can there be any legal justification for forcing persons off the public sidewalk.

However, the point of decision here is not this. Rather, it is that on the record of the bench finding that defendant was guilty "as charged in the affidavit," it is clear that, among other things, defendant was found culpable for "attempting to engage * * * in emotional argumentation concerning his draft law views and the war in Vietnam so as to disturb the quiet and good order" of the city. (See Affidavit set out in III above and *cf.* Footnote 5.) This is but a way of saying that the defendant was

convicted, at least in part, of attempting to express his views on obviously important subjects. Put another way, he was convicted of speaking out on a controversial issue.

By any standard, a condition giving rise to an allowable exception to free expression principles must be more than slight to be a danger at all and more than remote to be clear. By such tests, the words in this case certainly did not provide the provocation for an arrest ending speech.

While the bounds of permissible speech may be hazy at the edges, there is clearly room for a wide range of modes of expressions. This case provides a classic example plainly within the permissible category. The expression in issue involved at most a vehement speech and a positive leaflet on a controversial subject delivered and distributed, respectively, on the public streets under circumstances well under the control of legitimate policing authority. There was, on this record, no danger either by the "clear and present" or any other standard. The officers' uncertainty about whether to arrest supports this conclusion. (See Footnote 3.) The expression, then, was protected. It was only the evidence of conduct ancillary to the distribution of the leaflet that constituted action outside the bounds of protected expression. For reasons adduced hereafter, this excess, even if fully credited, did not legitimize the conviction of the defendant.[12]

We have said that the right of expression does not provide the condonation for the laying on of unwanted hands to make a point. That the state can prohibit such action is an evident proposition. Equally evident is the principle that the exercise of the vital right to speak is not

---

[12]Because we do not reach the question of the constitutionality of the ordinance but only its application, we assume without deciding that it is not impermissably vague. *Cf. NAACP* v. *Button, supra,* at 432, 9 L. Ed. 2d 405, 417; *Edwards* v. *South Carolina, supra,* at 237, 9 L. Ed. 2d at 703; it has an appropriate relationship to the safety of the city, *Herndon* v. *Lowry, supra*; *Thomas* v. *Collins, supra,* at 530, 89 L. Ed. at 440, and is legitimate, substantial and not overbroad; *Shelton* v. *Tucker* (1960), 364 U. S. 479, 488, 489, 5 L. Ed. 2d 231, 237-238.

to be confined to effete or mild expression[13] nor limited by whether the listeners approve the content.[14] Under the Constitution, commitment may be expressed with conviction. Overly nice calculations of tone and emotion could have no other than that chilling effect on speech which is anathema to our processes of government. Not to overdo a figure of speech, neither heat nor cold can be allowed to stultify the high purposes of the First Amendment. Our governmental life depends upon it:

"The vitality of civil and political institutions in our society depends on free discussion. As Chief Justice Hughes wrote in *DeJonge* v. *Oregon,* * * * it is only through free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected. The right to speak freely and to promote diversity of ideas and programs is therefore one of the chief distinctions that sets us apart from totalitarian regimes.

"Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, * * * is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. * * * There is no room under our Constitution for a more restrictive view. For the alterna-

---

[13] "* * * freedom to differ is not limited to things that do not matter much. T at would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." Justice Jackson for the court in *West Virginia State Bd. of Education* v. *Barnette, supra,* at 642, 87 L. Ed. 1639.

[14] "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas or beliefs which are offered.' *NAACP* v. *Button,* 371 U. S. 415 * * *." *New York Times Co.* v. *Sullivan* (1964), 376 U. S. 254, 271, 11 L. Ed. 2d 686, 701.

tive would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Terminiello* v. *Chicago, supra,* at 4-5, 93 L. Ed. 1134, 1135.

Here it is reasonably clear that speech is part of the proscription which the finding of guilt effects. And where a finding of guilt is based on an undifferentiated mix partially for what is said and partially what is illegally done, a conviction cannot stand. So vital is free expression that even decisional ambiguity will taint the finding. This is the clear teaching of *Stromberg* v. *California* (1931), 283 U. S. 359, 367-368, 75 L. Ed. 1117, 1122; *Williams* v. *North Carolina* (1942), 317 U. S. 287, 292, 87 L. Ed. 279, 282; and *Street* v. *New York, supra.*[15] And where the finding is supported on an ambiguous basis,[16] whether it is the result of a bench or jury trial is of no consequence. Nor is it "* * * appropriate to remand the case to the trial judge for a post hoc explanation * * * of his decision." *Street* v. *New York,* 394 U. S. at 586, 22 L. Ed. 2d at 581-582. It follows that the conviction of defendant Mechanic must be and is reversed and the defendant is discharged.

*Judgment reversed.*

WASSERMAN, J., concurs.

---

[15] "* * * we conclude that the case is governed by the rule of Stromberg, and that appellant's conviction must be set aside if we find that it could have been based solely upon his words and that a conviction resting on such a basis would be unconstitutional * * *.

"Moreover, even assuming that the record precludes the inference that appellant's conviction might have been based *solely* on his words, we are still bound to reverse if the conviction could have been based upon *both* his words and his act." *Street* v. *New York,* 394 U. S. at 586-587, 22 L. Ed. 2d at 582. (Emphasis supplied.)

*Cf.* "* * *It follows that instead of its being permissible to hold, with the state court, that the verdict could be sustained if any one of the clauses of the statute were found to be valid, the necessary conclusion from the manner in which the case was sent to the jury is that, *if any of the clauses in question is invalid* under the federal constitution, the conviction cannot be upheld." *Stromberg* v. *California, supra,* at 368, 75 L. Ed. at 1122. (Emphasis supplied.)

[16] On the record here, it might be concluded that the conviction was unambiguously based on the defendant's expression. *A fortiori,* such a conviction could not stand. See Fn 3 *supra.*

Manos, J., dissenting. The First Amendment right to free speech and assembly should be zealously guarded as an essential ingredient of a democratic society. No other amendment in the Bill of Rights deserves stronger enforcement. The majority discussion aptly points out the spirit of the law in the context of the United States Supreme Court decisions. However, this case before us is not a case of Harvey Mechanic fighting for his right to freely express his dissent on the war in Viet Nam, but it is a case of the public being free from physical intrusion while using the public sidewalks. Lest I be misunderstood, if the defendant appellant were prosecuted and found guilty of expressing his views on the nation's foreign policy, no dissent here would be necessary.

The affidavit charging defendant with violating Section 13.1126, Codified Ordinances of the city of Cleveland, is not ambiguous and does not charge Mechanic with "attempting to engage in emotional argumentation." The affidavit charges defendant with "blocking pedestrians on the sidewalk" while engaging simultaneously in "emotional argumentation." The latter statement was inserted only to show the atmosphere in which the illegal acts occurred. *It does not state a separate offense.*

The majority opinion relies heavily on *Street* v. *New York* (1969), 394 U. S. 576, 22 L. Ed. 2d 572, which holds at 590, 22 L. Ed. 584, that a conviction must be reversed if from an examination of the record one cannot "eliminate the possibility either that appellant's words were the sole basis of his conviction or that appellant was convicted for both his words and his deeds." After a careful examination of the record, there is no doubt that defendant was convicted solely for forcibly putting literature in a passerby's pocket and pushing him off the sidewalk.

The testimony elicited from the three prosecution witnesses was directed only to the acts performed by the defendant and not to the context of his speech. Any reference to appellant's dress or speech was brought into the case only to prove that defendant was the individual who committed the illegal acts. Even the defense counsel recog-

nized that the thrust of the prosecution had no relationship to the words spoken by Mechanic. At the close of the prosecution's case (R 26), the defense moved to dismiss the charges. In arguing the motion, counsel stated: "There is, indeed, a great conflict in the evidence between the three witnsses as to what transpired. *There is absolutely no evidence as to what the defendant said to anyone.*" (R 27). (Emphasis added.)

Any further references in the defendant's testimony to the context of his speech was brought out only to show Mechanic's aggressiveness and, therefore, his likelihood of committing the illegal acts. The testimony conclusively establishes that defendant was convicted only because of his conduct, which was consistent with the charge in the affidavit. Therefore, I dissent.